WILBER I. CRAM, APPELLEE, v. CHICAGO, BURLINGTON &
QUINCY RAILWAY COMPANY, APPELLANT.*

FILED JUNE 11, 1909.    No. 15,148

1. Statutes: CONSTRUCTION: CONSTITUTIONAL LAW. Sections 10606 and
10607, Ann. St. 1907, being chapter 107, laws 1905, do not contra-
vene sections 11 or 15, art. III of the constitution of Nebraska,
nor is said legislation repugnant to the fourteenth amendment to
the constitution of the United States.

2. Appeal: REVIEW. The defendant having failed to prove, or offer to
prove, any affirmative defense to an action under said statute,
save and except that as to its delay in forwarding óne car-load of
stock it did so in deference to the statute prohibiting the opera-
tion of trains on Sunday, and defendant having been given by
this court the benefit of said defense, it is unnecessary to de-
termine whether the statute precluded any other defense in said
action.

3 Carriers: REGULATION.    The legislature may provide by general law
that a shipper of live stock may recover liquidated damages from
a public carrier for failure to transport such stock committed to
the carrier for transit between stations in Nebraska.

4. ———: ———. Section 4, art. XI of the constitution, does not
prohibit the legislature from increasing the common law liability
of common carriers, and, in case the legislature expands such
liability, the courts will not declare the statute void on the com-
plaint of the carrier, because in some hypothetical case the law,
if applied, might work to the disadvantage of a shipper.

5. Commerce: REGULATION.    The statute does not interfere with or
regulate inter-state commerce.

6. Carriers: ACTION: DEFENSES: REVIEW. Where the evidence dis-
closed without dispute that as to one cause of action the delay
was occasioned by unloading the stock for feed, water and rest
at the feeding pens of defendant at a division point, and that to
have continued the shipment to the point of destination would
have probably compelled the carrier to have operated its trains
on Sunday and have resulted in the delivery of said stock on
the Sabbath, a judgment based on said count in the petition will
be reversed.

APPEAL from the district court for Garfield county:
JAMES N. PAUL, JUDGE. *Affirmed on condition.*

* See opinion on rehearing, 85 Neb. 586.

*James E. Kelby, Frank E. Bishop* and *Fred M. Deweese,* for appellant.

*E. J. Clements, contra.*

*William T. Thompson, Attorney General, C. C. Flansburg* and *B. T. White, amici curiæ.*

ROOT, J.

Action under chapter 107, laws 1905, being sections 10606 and 10607, Ann. St. 1907. Judgment was rendered in favor of plaintiff, and defendant appeals.

This case has been elaborately briefed and exhaustively argued by counsel for the respective litigants, and by friends of the court, but more attention has been given to the validity of the statute than to the facts in the instant case. The act is as follows: "Section 10606. It is hereby declared and made the duty of each corporation, individual, or association of individuals, operating any railroad as a public carrier of freight in the state of Nebraska, in transporting live stock from one point to another in said state in car-load lots, in consideration of the freight charges paid therefor, to run their train conveying the same at a rate of speed so that the time consumed in said journey from the initial point of receiving said stock to the point of feeding or destination, shall not exceed one hour for each eighteen miles traveled including the time of stops at stations or other points, provided, in cases where the initial point is not a division station and on all branch lines not exceeding 125 miles in length, the rate of speed shall be such that not more than one hour shall be consumed in traversing each twelve miles of the distance including the time of stops at stations or other points, from the initial point to the first division station or over said branches. The time consumed in picking up and setting out, loading or unloading stock at stations, shall not be included in the time required, as provided in

this schedule. Provided, further, that upon branch lines not exceeding 125 miles in length live stock of less than six cars in one consignment, each railroad company in this state may select and designate three days in each week as stock shipping days, and publish and make public the days so designated and after giving ten days' notice of the days so selected and designated, shall be required upon its branch lines to conform to the schedule in this act provided, only upon said days so designated as stock shipping days.

"Section 10607. Any individual, corporation, or association of individuals, violating any provisions of this act shall pay to the owner of such live stock, the sum of ten dollars for each hour for each car it extends or prolongs the time of transportation beyond the period herein limited as liquidated damages to be recovered in an ordinary action, as other debts are recovered."

1. It is argued that the legislature in enacting said statute violated section 11, art. III of the constitution, because the law, if given effect, amends sections 10596, 10597 and 10598, Ann. St. 1907, and the act of 1905 does not mention or repeal the statutes thus amended. The act under consideration is complete in itself, and, although it may conflict somewhat with section 10597, *supra*, it will not for that reason be held void, as the earlier act must yield to the later. *State v. Omaha Elevator Co.*, 75 Neb. 637; *Bryant v. Dakota County*, 53 Neb. 755. The act of 1905 does not in any manner modify sections 10596 or 10598, *supra*.

2. It is next suggested that the statute deprives a railway company of the equal protection of the law, in that it forecloses any defense that might reasonably exist in the carrier's favor and provides for the payment of an arbitrary sum to the shipper under certain conditions without regard to whether he is damaged or not, and thereby provides for the taking of the railway's property without due process of law. As to the first of the last

42

stated propositions, defendant is in the peculiar position of urging that it is without a defense, the statute being considered, and the court, not having the assistance of counsel on this branch of the law, will not exhaustively consider the question. The statute does not contain any exceptions, and defendant argues that neither the act of God nor inevitable accident would excuse it for failure to deliver a car-load of stock within the time limit. Although we do not agree with counsel, it is unnecessary to inquire concerning what facts would be a lawful excuse for a carrier in a suit like the one at bar. A statute will be read in connection with all other enactments upon that subject. *State v. Omaha Elevator Co.*, 75 Neb. 637; *Rohrer v. Hastings Brewing Co.*, 83 Neb. 111; Sutherland (Lewis), Statutory Construction (2d ed.), sec. 448. It is also a truism that "when statutes are made, there are some things which are exempted and *fore-prized* out of the provisions thereof, by the law of reason, though not expressly mentioned: thus, things for necessity's sake, or to prevent a failure of justice, are excepted out of statutes." Dwarris (Potter's), Statutes and Constitutions, p. 123, rule 5. It was held in *United States v. Kirby*, 7 Wall. (U. S.), 482, that, although the statute providing a penalty for interfering with the transmission of the mails did not contain any exception, yet an officer might lawfully arrest a mail carrier upon a warrant charging him with the crime of murder. See, also, *Tsoi Sim v. United States*, 116 Fed. 920, 54 C. C. A. (U. S.) 154; *State v. Barge*, 82 Minn. 256; *State v. Rollins*, 80 Minn. 216. In *Sullivan Savings Institution v. Sharp*, 2 Neb. (Unof.) 300, it was held that a mortgagee was not liable in liquidated damages for refusing to cancel a mortgage if the right of the person making the demand was not clear. The statute does not deny the carrier the right to defend an action brought thereon, nor state what, if any defenses may or may not be available in such a case. Defendant will not be in position to complain in this particular until, in a concrete case, wherein it has presented and main-

tained or offered to maintain a legitimate defense, the courts have determined that the statute denies the carrier that right. *Whitehead v. Wilmington & W. R. Co.*, 87 N. Car. 255; *Allen v. Texas & P. R. Co.*, 100 Tex. 525, 101 S. W. 792.

Concerning the claim that the enforcement of the statute will amount to the taking of defendant's property without due process of law, it may be broadly stated that the carrier is not situated with reference to the public, and the statute, as natural persons engaged in the ordinary vocations in life are with reference to each other. A speed of 12 or 18 miles an hour for defendant's freight trains is not *prima facie* unreasonable, because defendant's testimony shows that it operated said trains on some parts of its railway at the rate of 30 miles an hour. It may be expensive for the railway in every instance to maintain the average speed demanded by the statute. A car of live stock transported from a branch line to a division may not reach the latter station in time to be included within a freight train going in the desired direction on the main line, and to devote a locomotive exclusively to the one car for any considerable distance would entail a considerable expense for the carrier. However, the railway company is permitted to charge remunerative rates for the transportation of freight. Its methods of bookkeeping and of collecting and tabulating statistics are such that it can with reasonable exactitude ascertain the cost to it, and a fair charge to the shipper for transporting any particular property. If the legislature has by regulating the service increased the expense of transporting live stock in Nebraska, and to comply with the statute will wipe out a reasonable margin of profit for the carrier on all of its intrastate business, it has ample recourse in an increase of rates, so that in the end, viewed as a general proposition, the enforcement of the law to the extreme suggested by defendant's learned counsel will not deprive the carrier of any just profit nor take its property without due process of law. In the instant case,

the enforcement of the law, as we view the record, will
not deprive defendant of any constitutional guarantee,
state or national.   Defendant's property is affected by a
public interest, and, having devoted that property to a use
in which the public have an interest, it must, *to the limit
of the interest thus acquired by the public,* submit to the
control of such property for the public good.   *City of
Rushville v. Rushville Natural Gas Co.,* 132 Ind. 575;
*Chicago, B. & Q. R. Co. v. Iowa,* 94 U. S. 155.   The public
is interested not only in being permitted to have its prop-
erty transported for a reasonable compensation, but also
in having that property, especially if subject to rapid de-
preciation, transported with reasonable promptness and
care.

Before the enactment of this statute, the carrier was
liable in damages to the shipper if it unnecessarily and
unreasonably delayed the transportation of live stock
committed to its possession for carriage.   *Nelson v. Chi-
cago, B. & Q. R. Co.,* 78 Neb. 57; *Denman v. Chicago, B. &
Q. R. Co.,* 52 Neb. 140.   The legislature, in passing from
the subject of compensation to that of service, kept well
within its constitutional rights, and the inquiry should
be confined to ascertaining whether the operation of the
law will impose such an undue burden upon the carrier as
to take from it something for which the public will not
give an adequate return.   It is a matter of common knowl-
edge that live stock confined in a freight car deteriorates
in condition, and that, if the animals are to be placed on
the market within a short time of the termination of
transportation, the depreciation is not confined to a
shrinkage in weight, but to many other factors difficult to
prove, but actually existing and seriously affecting the
market value of said property.   As the damage accruing
from the protracted confinement of stock is difficult to
prove with reasonable exactitude, and yet always exists,
the legislature has the power to provide for liquidated
damages.   Such legislation is not unsound in principle
and has been upheld in many courts.

Section 4966 of the Revised Statutes of the United States provides that one who publicly performs a dramatic composition without the permission of the owner of the copyright thereof, if it has been copyrighted, shall be liable in damages in at least $100 for the first performance and $50 for each subsequent production. In *Brady v. Daly,* 175 U. S., 148, the statute was upheld, not as a penalty, because it was said only the owner of the copyright may bring the action, nor as a punishment to the wrongdoer, but as a reasonable liquidation of the damages which the proprietor had suffered from the wrongful acts of the defendant. So, also, where the statute provided for a flat recovery of a stipulated sum for the negligent killing of a person, the act was held not to deprive defendant of property without due process of law. It might be that substantial damages had not accrued to the plaintiff in a particular case. In some instances the damage would be insignificant, and in others death would relieve the plaintiff of a pecuniary burden. Under that statute it would not avail the defendant to plead and offer to prove that the deceased was a helpless cripple, or in the last stages of tuberculosis, nor would it be heard to say that its property was in danger of being taken without due process of law. *Coover v, Moore & Walker,* 31 Mo. 574; *Carroll v. Missouri P. R. Co.,* 88 Mo. 239.

Counsel for defendant argue that the statute purports to give more than compensatory damages, and therefore is controlled by *Atchison & N. R. Co. v. Baty,* 6 Neb. 37, but that case merely disapproved a statute that purported to give double damages, and, if the act under consideration provided for the recovery of double or treble damages, we would not hesitate to apply the earlier case to the instant one. Such is not the case. On more than one occasion we have upheld the right of the legislature to liquidate damages that may arise from the default of a person under circumstances which preclude the ascertainment of the actual damages suffered by the aggrieved person. In *Graham v. Kibble,* 9 Neb. 182, a recovery of

the statutory damages of $50 against a public officer for collecting a greater fee for his official services than the law prescribed was affirmed. In *Clearwater Bank v. Kurkonski*, 45 Neb. 1, the statute permitting a mortgagor to recover from the mortgagee $50 liquidated damages for failing to release a chattel mortgage after it had been fully paid was sustained; and in *Hier v. Hutchings*, 58 Neb. 334, we approved the statute providing for the recovery of $500 against an officer for rearresting a person who had been discharged on a writ of habeas corpus for the same offense as that described in the officer's warrant. Counsel distinguished those cases relating to public officers for the alleged reason that the legislature may subject the occupant of a public office to damages for particular unlawful acts committed in the conduct thereof. Although the legislature may not prohibit the carrier from transacting business, yet it may regulate the affairs of that public servant, and much of the reason for sustaining the power of the legislature to provide that public officers shall pay a definite sum as liquidated damages for acts of commission or omission applies to like provisions in statutes passed to regulate public carriers in the transaction of their business.

3. It is argued that the constitution of the state provides that "the liability of railroad corporations as common carriers shall never be limited" (art. XI, sec. 4) ; that the shipper might suffer a greater damage by reason of delay in the transportation of his stock than he could recover under the act in question; that the statute would prevent the shipper from recovering his actual damage, and therefore is void for that reason. Such a condition could not prejudice the defendant, and it cannot litigate a shipper's rights in a hypothetical case that may never be presented to this court. *Commonwealth v. Wright*, 79 Ky. 22; *State v. Becker*, 3 S. Dak. 29; *Lake Shore & M. S. R. Co. v. Ohio*, 173 U. S. 285, 308.

4. Defendant asserts that many of the shipments complained of were carried in interstate trains, and that the

statute interferes with interstate commerce, and cite *Houston & T. C. R. Co. v. Mayes*, 201 U. S. 321. Counsel have not referred to any admission in the pleadings or to a syllable of testimony that will sustain the claim advanced. All of the stock was transported between points within the state, and no part of the route traveled extended beyond the borders of Nebraska. The United States supreme court in *Houston & T. C. R. Co. v. Mayes*, *supra*, considered an interstate shipment, and only determined that the Texas statute was invalid in so far as it might be applied thereto, and subsequently the law was held valid as applied to intrastate shipments. *Allen v. Texas & P. R. Co.*, 100 Tex. 525, 101 S. W. 792. Nor would we concede that, by including the cars in a train made up partially of cars which contained property consigned to points without the state of Nebraska, defendant could avoid the statute so far as the intrastate shipments were concerned. *Hennington v. Georgia*, 163 U. S. 299, 317.

5. It is suggested that the statute is class legislation and inimical to section 15, art. III of the constitution. The act operates uniformly upon all persons coming within the class, and the classification has reason to justify its existence. The greater part of freight is inanimate, and much of it will not depreciate if delayed somewhat in transportation; but live stock, peculiarly of all perishable freight, must be handled expeditiously to preserve its value. Vegetables, if kept warm in winter, will not deteriorate if leisurely transported, and fresh fruit, meat and dairy products, if chilled and kept at a proper temperature, may be delayed in transit during warm weather and still arrive fresh and wholesome at the point of destination; but, regardless of the season or weather, speed is an essential element in the proper transportation of live stock by the carrier. We conclude that the law does not violate said section of the constitution. *Cleland v. Anderson*, 66 Neb. 252.

6. As to the first cause of action, plaintiff was permitted to recover for a delay of 24 hours in the shipment of one

car of stock. It is undisputed that said stock was shipped from Burwell in the forenoon of Saturday, the 1st of July; that in the regular course of transit it would pass through the city of Lincoln, where defendant maintains extensive yards and pens for feeding, watering and resting stock; that plaintiff's stock arrived at said point at 10:30 P. M. of said Saturday, which was within the time fixed by the statute, and was unloaded, fed and retained until Sunday night, when they were forwarded to South Omaha. Therefore, out of the 24 hours' delay in said shipment for which plaintiff recovered judgment, 23 hours and 15 minutes may be accounted for by said stop at the feedyards. If this time may be deducted, there was less than one hour's delay in said shipment, and plaintiff would not be entitled to recover therefor. The statute only binds the carrier to maintain the minimum rate of speed between the initial point "of receiving said stock to the point of *feeding or* destination." Defendant was within the letter of the law. Furthermore, the cattle were fed at Lincoln, and the time consumed there should not in our judgment have been charged against the carrier. We are of opinion that defendant was not required to continue running its train on Sunday, nor to deliver the stock at or about 12 o'clock Saturday night, and that it might with propriety have refused so to do without incurring a bill for damages. To that extent, at least, a defense was presented, and plaintiff should not have recovered on his first cause of action.

There is some evidence in the record to the effect that one car of stock was transported from Ashland to South Omaha via Fort Crook, a somewhat longer route than by Gretna; that the grades on the former line are lighter than on the latter, and this fact and a congestion of trains on the Gretna route impelled the choice of the Fort Crook line. The pleadings, however, do not admit the consideration of this extra mileage, which we are of opinion might have been considered had a proper issue been presented. There is also some evidence that at the stations inter-

mediate Burwell and South Omaha some time was con-. sumed in setting out and picking up stock, for which defendant would have been entitled to credit had there been anything tangible and definite in the testimony on said point; but, in the. condition of the record, neither the district court nor this court can find that on any particular shipment any definite deduction should have been made.

There is also considerable evidence tending to show, as a general proposition, that in the management of its traffic defendant is compelled to sidetrack trains and wait for passing trains; that defendant has installed a block service on its main line, and must at times delay a train until the one preceding it going in the same direction has cleared the block before the former may be permitted to enter it, but no one can apply this evidence so as to find as a matter of fact that as to any of the shipments a delay for any definite period was occasioned by the natural results of a careful operation of defendant's trains. It will therefore be unnecessary to consider whether those facts, if properly presented, would have constituted a defense to this action.

The judgment entered, to the extent of $240, is excessive. Therefore, unless the plaintiff within 30 days of the filing of this opinion remits from the judgment recovered in the district court the sum of $240 as of the date said judgment was entered, this case will be reversed and the cause remanded for further proceedings; but, if such remittitur is filed as aforesaid, the judgment of the district court will be affirmed, and in that event each party will pay its own costs in this court.

AFFIRMED.

FAWCETT, J., concurring.

I concur in the majority opinion, but only upon the ground that we are concluded by numerous former decisions of this court upon kindred questions. I have always questioned the power of the legislature arbitrarily to

determine that one party to a civil contract shall, in the
event of a failure on his part to perform some condition
thereof, pay to the other party damages which such other
party has not sustained.  To my mind the true and only
just measure in all such cases is actual damage.  But, in
order to hold the law under consideration in this case
invalid, we would be compelled to overrule a number of
former decisions of this court.  This a court of last resort
should never do, except in extreme cases.  I know of
nothing more conducive to the well-being of a state than
a settled state of the law.

BARNES, J., dissenting.

I am unable to concur in the majority opinion.  As I
view the act in question, it is unconstitutional for several
reasons; but for the sake of brevity I shall discuss but
one of them.

It clearly appears from the opinion of my associates
that, in order to uphold the statute, they have been com-
pelled to read into it certain exceptions to its operation,
and have intimated that the court may, in a proper case,
consider others.  We have thus enlarged and changed the
act by what seems to me to be judicial legislation to such
an extent as to make a law which is quite different from
the one passed by the legislature.  It will be observed that,
by the plain language of the statute, common carriers, in
transporting live stock in car-load lots over their lines in
this state, must maintain a speed of 18 miles an hour on
their main and 12 miles an hour on their branch lines,
and as a penalty for a failure to maintain that rate of
speed they must pay to the shipper the sum of $10 a car
an hour for each and every hour consumed beyond said
time limit, even if no damages are caused by the delay.
To the operation of this law the statute itself contains no
exceptions and permits of no excuses.  One of the defend-
ant's contentions is that the law is unconstitutional be-
cause it contains no exemption from liability even where

the delay is caused by the act of God or the public enemy. I think however, this contention cannot be sustained, for it may well be said that such an exception is always understood and will be supplied by implication. So far, I am in accord with my associates, but such a rule does not apply to the failure to operate trains on Sunday and to delays caused by unavoidable accidents and the unlawful acts of third persons.

It is conceded, in effect, by the majority opinion that without the last-named exceptions the statute is unconstitutional. It will be observed that as to the plaintiff's first cause of action, which was for a delay which occurred on Sunday at the feedyards in Lincoln, the defendant is held not liable. It seems clear that to this extent the opinion amends the law, and this therefore amounts to judicial legislation. This should not be resorted to in order to uphold an act which, as it comes from the legislature, in effect deprives the carrier of his property without due process of law. In *In re Contest Proceedings,* 31 Neb. 262, it was said: "*A casus omissus* in a statute cannot be supplied by a court of law, for that would be to make laws." Where the words of a statute are plainly expressive of an intent not rendered dubious by the context, the interpretation must carry out that intent. It matters not in such a case what the consequences may be. It has therefore been distinctly stated, from early times down to the present day, that judges are not to mould the language of the statute in order to meet an alleged convenience, or an alleged equity; are not to be influenced by any notions of hardship, or of what, in their view, is right and reasonable. They are not to alter clear words, though the legislature may not have contemplated the consequences of using them; and, however unjust, arbitrary or inconvenient the intention may be, the statute must receive its full effect. What is called the policy of the government with reference to any particular legislation is too unstable a foundation for the construction of a statute. The clear language of a statute can be neither restrained nor ex-

tended by any consideration of supposed wisdom or policy; and, even when the court is convinced that the legislature really meant and intended something not expressed by the phraseology of the act, it will not deem itself authorized to depart from the plain meaning of the language which is free from ambiguity. It must be construed according to its plain and obvious meaning, though the consequences should defeat the object of the act. A construction not supported by the language of the statute cannot be imposed by the court in order to effectuate what may be supposed to be the intention of the legislature. Endlich, Interpretation of Statutes, secs. 4, 5, 6. When the words of the statute admit of but one meaning, a court is not at liberty to speculate on the intention of the legislature, or to construe an act according to its own notions of what ought to have been enacted. The moment we depart from the plain words of the statute in a hunt for some intention founded on the general policy of the law, difficulties will meet us at every turn. Indeed, to depart from the language of the act is not to construe, but to alter, it, and this amounts to judicial legislation.

Again, the power of construction is restrained by certain well-settled rules, and, if this were not so, its use would often amount to usurpation of legislative power; and, as was said in *Gage v. Currier*, 4 Pick. (Mass.) 399: "A violation of the constitution we are sworn to support." In *Hyatt v. Taylor*, 42 N. Y. 258, it was held that "no rule of public policy, no necessity, no violation of right, no evidence of intent derivable from the terms of the statute or from its design, permits * * * a restriction of its plain and explicit language." I am therefore of opinion that when, in order to prevent a law from being declared unconstitutional, it is necessary to amend it by judicial construction, it is the duty of the court to promptly declare it unconstitutional, and thus avoid usurping legislative powers.

For the foregoing reasons, among others, it seems clear to me that the law in question should be declared uncon-

stitutional, and the judgment of the district court should be reversed.