[No. 7908.]

THE COLORADO AND SOUTHERN RAILWAY CO. v. THE STATE RAILROAD COMMISSION ET AL.

1. CONSTITUTIONAL LAW—*Particular Statutes*—The act for the appointment of a railroad commission (Laws 1907, 531, Rev. Stat. c. 121 art. vii.) is a constitutional enactment. *Consumers League v. Colorado &c. Co.*, 53 Colo. 54 followed.

2. ——*Delegation of Legislative Power*—The constitution prohibits the delegation of the powers of the legislature. A statute (Laws 1910 c. 5) required every railway company to furnish cars to shippers; to prescribe reasonable time schedules for the operation of trains; prohibited undue advantages to particular localities; and required the utmost diligence in the carriage of goods committed to them for transportation. Neither the number of trains to be operated, the time within which any train should run, or the equipment of the trains was specified. Other provisions of the act provided for the appointment of a commission charged with the administration of the statute, and authorized to direct what equipment should be supplied, what trains should be operated, and what other duties expressly or impliedly imposed upon common carriers should be exacted of them. *Held*, not a delegation of legislative power.

3. STATUTES—*Construction*—A statute which is essentially remedial, *e. g.*, the act creating the railroad commission (Laws 1910 c. 5) is to be liberally construed to accomplish its object.

The title of an act may be resorted to to aid in ascertaining the legislative intent.

4. ——*Construed*—The defendant railway company had abandoned the operation of that part of its railway between Breckenridge and Como, twenty-one miles in length, and operated only a combination train between Denver and Como. The effect was that all the freight between Denver, the commercial and political center of the state, and Breckenridge, a mining village of 800 souls, was required

to pass by another railroad, a distance of 317 miles, breaking bulk on two occasions, and consuming several days; whereas if trains were regularly operated upon defendant's railway, the distance was only 110 miles, and the freight was received upon the day of its shipment. Passengers, too, were required to go by the same circuitous route, and one desiring to travel from Breckenridge to Como, only 21 miles by defendant's railroad, was required to travel nearly 400 miles. Moreover the freight charge, and the passenger rate, were greatly increased. *Held*, that under the act creating the railroad commission (Laws 1910 c. 5) the commission was authorized to require the defendant to resume the operation of its line between Como and Breckenridge, and to operate a passenger train, daily except Sundays, between Denver and Leadville by the way of Como and Breckenridge, and a through freight train at least three days in each week.

Section 11 of the amendatory act organizing the railroad commission (Laws 1910 c. 5), provided that three commissioners should be appointed by the governor, but with the proviso that those elected under the original act should continue in office for certain terms specified. *Held*, that the effect of the statute was not to create an office, and at the same time designate the persons who should fill it, but to retain the commissioners then in office by election of the people, excepting them from the operation of the power of appointment conferred upon the executive.

The constitution (art. XV, sec. 3) provides that the general assembly may alter the charter of any corporation theretofore granted, when in their opinion injurious to the citizens of the state, "but only in such manner that no injustice shall be done to the incorporators."

A statute (clause 6 sec. 602 Mills Stat.) provides that railroad companies organized under the act shall have power "to regulate the time and manner in which passengers and property shall be transported, and the compensation to be paid therefor." *Held*, that the rights thus granted were not unlimited, and to be exercised without regard to the interest of the public; that the anticipated benefit to the public was the consideration of the franchise granted; that the acceptance of the grant by the corporation imposes upon it the obligation to operate its railroad, when constructed, in the manner and for the purposes contemplated by the statute; that the grant must be read in connection with the other provisions of the statute, and with the obligations which the law, independent of any statute, impliedly imposes, to furnish such service as may reasonably accommodate the public; that the surrender, either by constitutional or statutory provision, of the power of the state to reasonably control railroad companies is not to be inferred in the absence of positive words to that effect, and no such words are found either in the constitution or statute.

*Held*, further,. that to require .a railway company to resume the operation of a portion of this railway which it had abandoned, even though such operation might be unprofitable, was not an injustice to the corporation, nor , the taking of its . private property without due process of law, where it appeared that the suspension of operation had occasioned and would occasion great inconvenience and . additional burdens to the public.

5. RAILROAD COMPANIES—*Duty to Operate Constructed Lines*— Whether a railway company can be compelled . to construct the · line which .it has adopted in its charter, *quaere*.

But a railway company may, where the public interest requires, be compelled to resume the operation of a part of its constructed line which it has abandoned, even though in fact such operation may be at a loss.

The railway company claiming that the operation of a particular branch or part of 'its railway will be unprofitable has the burden of proof.

The evidence examined, and held that the railway company had not sustained this burden.

The question of loss must be considered in connection with the .duties of the railway company to the public, and the result of its corporate business, as a whole; it is not to be excused from performing its whole duty, merely because by ceasing to operate a part of its system the net returns will be increased.

6. RAILROAD COMMISSION—*Powers*—An order of the railroad commission requiring a railroad company to resume the operation of a branch of 'its railroad which it had abandoned, to operate passenger trains daily except Sundays, and three freight trains weekly, approved, and the decree of the district court enforcing the order affirmed.

· *Error to Summit District Court.*—Hon. J. E. Rizer, Judge.

Mr. E. E. Whitted, Mr. John A. Ewing and Mr. R. H. Widdicombe, for plaintiff in error.

Hon. Benjamin Griffith, attorney general, Theo. M. Stuart, Jr., assistant attorney general, for The State. Railroad Commission.

Mr. Barney L. Whatley, for the Breckenridge Chamber of Commerce.

Mr. Justice Gabbert delivered the opinion of the court:

The .Colorado and Southern Railway Company is a corporation organized under the laws of this state. It owns a

standard gauge line from Orin Junction, one hundred and fifty miles north of Cheyenne, Wyoming, extending southerly through Colorado to Denver, and thence to a point near the New Mexico-Texas line. In addition to this system, it owns a narrow gauge line, extending southwesterly up and along Platte Canon to Como, from Como over Boreas Pass, down into Breckenridge, then up and over Climax Pass into Leadville; also, a line extending from Como southwesterly through the town of Buena Vista to Gunnison, and thence to Baldwin, about twenty miles from Gunnison. This narrow gauge line is about three hundred and thirty-five miles in length; is known as the South Park division of The Colorado and Southern Railway Company, and is connected with, and forms a part of the system operated by the company as a whole. It is shown more particularly on the following map:

The South Park line has been operated continuously previous to the winter of 1910-1911 by the railway company and its predecessors for about thirty years, during which period the service consisted of not less than one passenger train each way each day, from Denver to Leadville, and one freight train each way each day between the same points. In November, 1910, the railway company ceased to operate that portion of its line from Como to Breckenridge, and refused to receive or transport either passengers or freight over its road between these points. The service was then limited to a combination freight and passenger train between Como and Denver, and a similar service between Breckenridge and Leadville. In the summer of 1911 a passenger train daily, except Sunday, was operated between Leadville and Breckenridge, with a stub train from Breckenridge to Como, and a combination train from Como to Grant, connecting with a passenger train at the latter point for Denver. This service was continued until January, 1912, when the stub train between Breckenridge and Como was discontinued. In the meantime the passenger train from Grant to Denver was taken off, and a combination train run between Como and Denver. The passenger service between Breckenridge and Leadville was continued, and also a tri-weekly freight train between these points. By reference to the above map, it will be seen that passengers from Breckenridge for Denver were compelled to go to Leadville, and thence over the Denver & Rio Grande, via Pueblo, or over the Midland, via Colorado Springs.

In the latter part of 1911, the Breckenridge chamber of commerce filed a petition with the state railroad commission, setting forth the facts above narrated concerning the operation of trains down to that time, and charged that, unless restrained, the railway company, during the winter of 1911-1912, would cease to operate its road between Como and Breckenridge, and probably for all time to come; and that freight from Breckenridge to Denver, or *vice versa*, had to be shipped over the Denver & Rio Grande via Leadville and

Pueblo. The petitioner asked that the railway company be ordered to operate its line between Como and Breckenridge, and to receive and transport freight between Denver and Breckenridge and all intermediate points, and provide an exclusive passenger service between Denver and Leadville, daily, including Sunday.

The railway company filed an answer, challenging the jurisdiction of the commission to make any order in the premises, denied that closing the road between Como and Breckenridge occasioned any damage to the citizens of Breckenridge and Summit county; admitted that it had declined to receive freight for transportation from Denver, through Como to Breckenridge, that such freight, when conveyed to Breckenridge, was shipped *via* other lines of road, through Colorado Springs and Pueblo to Leadville, and then reshipped to Breckenridge; admitted that it refused to receive for transportation any freight between Como and Breckenridge, consigned to Breckenridge; and had refused to receive and transport over its own line freight consigned to Breckenridge originating at Denver or points between Denver and Como. It then set forth at some length the physical character of its line from Denver to Leadville, the fact that it was built through a canon and over high mountain passes; that the grades and curves between Como and Breckenridge were excessive; that there was no business between these points; that the line was often closed by storms and snowslides, which imposed upon the company a heavy expense; that during the year 1910 the operation of the road betwen Como and Leadville resulted in a heavy deficit; that there was no prospect of an improvement of business over the line; that there was no necessity for operating a railroad between Como and Breckenridge, and not enough business between these points to pay the operating expenses of running trains and maintaining a road, and that the railroad facilities to and from Breckenridge via Leadville were adequate and conducted at a heavy loss.

On the issues thus made the trial before the commission resulted in an order, directing the railway company, on or before the first day of January, 1912, and during a period of two years thereafter, to maintain, operate and conduct a through freight service between Denver and Leadville by way of Como and Breckenridge, at least three days each week; and also, from the same date and during the same period, to operate and maintain a through and exclusive passenger train service daily, excepting Sunday, between Denver and Leadville via Como and Breckenridge. The railway company declined to obey the order of the commission. Thereafter, proceedings were instituted in the district court to enforce the order of the commission, the state railroad commission and the Breckenridge chamber of commerce joining as plaintiffs in the case.

The complaint set out the order of the commission and the refusal of the railway company to obey it. It prayed for an order that the railway company be required to answer the petition, and show cause why the order of the commission should not be obeyed, and for an injunction or other process requiring the defendant to comply with the order of the railway commission. To this petition the railway company filed a demurrer, raising various questions, which was overruled. Thereafter the company filed its answer, wherein it pleaded three separate defenses which, in the main, raised the same questions presented by the answer filed with the commission, and in addition pleaded that the order of the commission, if enforced, would deprive the company of its property without due process of law. This answer will be noticed more in detail, so far as necessary, in the course of the opinion.

The cause was tried to the court on the testimony taken before the commission, and some additional evidence introduced by the respective parties. The facts thus established will be noticed later, in connection with the questions presented for determination. The court directed that an injunction issue, commanding the railway company to comply with

the order of the railroad commission. The railway company brings the case here for review on error.

From the record and briefs of counsel, the questions presented for consideration are substantially as follows:

1. Whether the railroad commission act confers authority upon the railroad commission to make the order sought to be enforced.

2. Whether any of the members of the commission were legally chosen as members of that body.

3. Whether, if the commission was validly chosen, and is a legal and constitutional body, its order is, in effect, the exercise by the commission of legislative power.

4. Whether the constitutional and statutory provisions of the state in effect at the time the plaintiff in error was organized, required it to operate the abandoned portion of its line.

5. Whether, if it be conceded that the commission had power to make the order complained of, the act of 1910, giving this power, is constitutional; that is, whether the act and the order by the commission do not amount to an impairment of the plaintiff in error's charter or contract rights; and

6. Whether the order of the commission in effect is so oppressive, unjust and unreasonable, if enforced, as to result in taking the property of the plaintiff in error without due process of law, and without just compensation, contrary to the constitution of the United States.

Counsel for plaintiff in error contends that the act of 1910, by virtue of which the railroad commission acted, does not confer upon the commission the power or authority which it exercised, in that it does not confer authority upon the commission to order the resumption of traffic over an abandoned line, and particularly, does not confer authority upon that body to say what number of freight trains shall be operated, and that it has no authority whatever to direct the movement of passenger trains. In other words, counsel for plaintiff in error contends that with respect to freight trains, the au-

thority of the commission is limited to orders directing a railroad company to provide a sufficient number of cars to transport its freight traffic, a reasonable time schedule for such trains, to require such repairs to be made and to provide such equipment as will be necessary and within the reasonable power of the railroad to make or adopt for the promotion of the security of persons as to life and limb, or for the convenience and accommodation of the public in the handling and shipment of property; and as to passenger trains, that the authority of the commission is limited to orders requiring a railroad company to make such repairs and provide such reasonable equipment as may be necessary for the safety of persons as to life and limb. The sections of the act, Laws 1910, pages 45 *et seq.*, upon which this contention is based, are as follows:

"Sec. 2. The term "common carriers," as used in this act, shall also include express companies, private freight car lines and pipe lines. The term "railroad," as used in this act, shall include all bridges used or operated in connection with any railroad, and also all the roads in use by any corporation operating a railroad, whether owned or operated under a contract, agreement or lease; and shall also include all switches, spurs, tracks and terminal facilities of every kind, used or necessary, in the transportation of the persons or property designated herein, and also all freight depots, yards, and grounds used or necessary in the transportation or delivery of any such property; and the term "transportation" shall include all cars and all other vehicles and instrumentalities and facilities of the shipment or carriage, irrespective of ownership or of any contract, express or implied, for the use thereof, and all service in connection with the receipt, delivery, elevation and transfer in transit, ventilation, refrigeration or icing, demurrage, storing, or handling of property transported, and it shall be the duty of every common carrier, subject to the provisions of this act, to provide and furnish such transportation upon reasonable request therefor, and to establish through

routes, and just and reasonable rates applicable thereto, and to provide a sufficient number of cars and a reasonable time schedule for trains."

"Sec. 25. It shall be the duty of every common carrier to transport any and all shipments between points in this state with the utmost diligence, and to move livestock and perishable products towards destination · continuously, without unnecessary delays, or longer stops than, or regular stops at stations, or stops for feeding, icing, or watering, and at a minimum speed of not less than ten miles per hour. * * * ."

"Sec. 27. If, in the judgment of the commission, after a careful personal examination and investigation, and after a hearing before the commission, or the opportunity for such hearing, the commission shall find that repairs, improvements or increased facilities in respect to roadbed, trackage, rolling stock, stations and depots, yards, terminal facilities, switches, signals, or any other element of the service of any common carrier shall be necessary and within the reasonable power of any common carrier to make or adopt for the promotion of the security of persons as to life and limb, or for the convenience and accommodation of the public, in the shipping and handling of property, the commission shall make such reasonable order requiring any common carrier to do any such thing deemed by the commission to be proper in respect to such matters within a reasonable time, to be fixed by the commission, as to them shall seem so necessary, and so within such reasonable power of such common carrier; and the orders of the commission in such respect shall be enforced by the proper writs and orders of courts of common jurisdiction."

One of the defenses interposed and upon which the railway company justifies its action in abandoning the portion of its road between Breckenridge and Como, which is twenty-one miles in length, is, that on account of the altitude, heavy grades and sharp curves, trains can not be operated over it except at a heavy loss. Eliminating, for the present, this feature of the case, we will consider, first, the contention with

respect to ordering the resumption of trains over the aban-doned portion of the road, and the authority of the commis-sion to direct what freight trains shall be operated between Leadville and Denver; and, second, the authority of the com-mission to order the operation of exclusive passenger trains between these points.

The questions involved in the first propositions are closely related and can be considered together. It appears from the testimony that perishable, as well as other, articles of property are shipped from Denver to Breckenridge, and likewise from Breckenridge to Denver. The route by which they are now shipped is over the Denver & Rio Grande Railroad, a standard gauge line, via Pueblo and Leadville to Breckenridge, and from Breckenridge to Denver over the same route, a distance of 317 miles. At Leadville a shipment from Denver to Breck-enridge must be transferred to narrow gauge cars and hauled to Breckenridge, while shipments to Denver from Brecken-ridge, or other points between, must be reloaded from narrow to standard gauge cars. From Breckenridge to Denver, over the narrow gauge line is 110 miles. In order to make a ship-ment from Breckenridge to Como, the cars in which freight is transported are hauled to Leadville, where the articles being transported are loaded into standard gauge cars, and from thence taken via Pueblo to Denver, where the shipment must again be transferred to narrow gauge cars and hauled over the South Park division to Como, a distance of something like four hundred miles, in order to reach a point distant only twenty-one miles from the place of shipment.

In addition to this it is also proper to note that Denver is the capital and commercial center of the state; that the mail, express and passenger service between Denver and Breckenridge and *vice versa* is now between fourteen and twenty hours, where, prior to the abandonment of the service from Como to Breckenridge, it was between six and seven hours; that passengers traveling between these places must pay additional fares above that paid when the South Park line was

operated from Denver to Leadville; that it now takes from four to five days to transport freight from Denver to Breckenridge via Leadville, when, before, freight from Denver would reach Breckenridge on the same day it was loaded on the cars. This was important to the citizens of Breckenridge in view of the fact that perishable articles, in many instances, could be shipped by freight instead of by express, as they generally must be when transported via Leadville. It is apparent that the change necessitates residents of Breckenridge paying the difference between freight and express rates on perishable articles of merchandise. It also appears from the testimony that after the company ceased to operate its line between Breckenridge and Como, it refused to furnish cars at stations between these points in which to ship ores, or transport supplies to such points, and that on this account, at least one mine could not be operated unless a wagon road was constructed to Breckenridge at a cost of about ten thousand dollars; and that it cost the operators of another mining property between Breckenridge and Como a dollar and a half per ton more to haul by wagon to Breckenridge than it did to haul it to a switch or spur where ore was received for shipment before the line between Breckenridge and Como was closed.

On the subject of freight and express, the commission, in its finding and order, said: "The defendant urges that it is offering, as a compensation to the patrons of their road, a through route around by way of Colorado Springs or Pueblo, but is this adequate compensation? It was testified to by the witnesses that when this line was operated as a through route from Denver to Leadville, that a merchant could order his merchandise in the evening in Denver and receive the same the next morning in Breckenridge or Leadville by freight. Now all perishable merchandise must be sent by express, if it goes over defendant's line; and if sent by freight it takes from three to six days to go around by the way of Pueblo or Colorado Springs, and may thus be destroyed." That the change in the operation of the road causes delay, and works

a great inconvenience to the inhabitants of Breckenridge, imposes upon them additional expense in obtaining perishable articles from Denver, and at least embarrassed the operation of mines located between Como and Breckenridge, is manifest. These results are caused entirely by the refusal of the railway company to operate trains over its twenty-one miles of track between Como and Breckenridge. Eliminating, as we have said, for the present any valid reason which might excuse the railway company from operating its twenty-one miles of railway between Como and Breckenridge, ample authority is found in the sections of the act quoted, as well as others, for the commission to direct traffic to be resumed over this abandoned portion of the road, and what freight trains shall be operated over it.

In section 2 of the act, it is made the duty of every common carrier, subject to the provisions of the act, to furnish transportation, to establish through rates, to provide a sufficient number of cars, and a reasonable time schedule for trains. By section 25 it is made the duty of a railroad company to transport all shipments between points in this state with the utmost diligence, and to move perishable products without unnecessary delays; while, by section 27, the railroad commission is empowered to require a railroad company to furnish such facilities for the convenience of the public for shipping and handling property as, in the judgment of the commission, is necessary and within the reasonable power of the railroad company to furnish.

The prime purpose of these provisions is to impose upon a railroad company, in its capacity as a common carrier, the duty to afford shippers reasonable facilities for the transportation of property without unnecessary delay. Merely furnishing cars would not effect this object. They must be moved, and hence, we find the act requires the common carrier to transport shipments with the utmost diligence; and if it fails in this particular, the commission, by virtue of the provisions of section 12 of the act which empowers that body to enforce

its provisions, may require it to furnish such facilities within its reasonable power as may be necessary, in order to compel it to discharge its duty to the public. Clearly, then, if a railroad company does not operate a sufficient number of trains to reasonably serve the needs of shippers, the commission has the power to direct it to increase its service in this respect; or, if it operates its trains over such routes, by reason of a link in its line being abandoned, that unnecessary delays are occasioned, it is not transporting shipments with that degree of diligence which the act requires, and the commission, by virtue of the provisions of sections 12 and 27, is empowered to direct that it transport freight over the abandoned part of its line, when by so doing shipments will be greatly facilitated, and burdens imposed upon shippers removed, unless the railroad can justify its action in abandoning such part of its line—a proposition we shall consider later.

Counsel for plaintiff in error contends the act does not authorize the commission to direct the running of passenger trains. In express terms it does not, but the act is essentially remedial, and will, therefore, be liberally construed to accomplish its object.—*Consumers' League v. Colorado & Southern Ry. Co.*, 53 Colo. 54; 125 Pac. 577. The settled canons of judicial construction require that possible interpretation to be given a statute which will render it effective, and effect the purpose of the legislative intent, if such intent can be reasonably ascertained. The title of an act, although not declaratory of the law, which must appear in the act itself, may, nevertheless, be resorted to for the purpose of ascertaining the legislative intent. By reference to the title of the act under consideration, it will be found that its object, among other things, is to create a state railroad commission, to prescribe and define its duties, to insure an adequate railway service, and to exercise general supervision over the conduct and operations of common carriers. From this title, declaring as it does, that the purpose of the act is to regulate common carriers, and to this end, to "insure an adequate railway serv-

ice," it must be presumed that the purpose of the general assembly, in passing the act, was to require common carriers to provide each locality along its line with adequate passenger service, unless the contrary clearly appears in the body of the act.

Turning to section 5 of the act, we find it provides "That it shall be unlawful for any common carrier, subject to the provisions of this act, to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation or locality, or concerning any particular description of freight traffic, in any respect whatsoever; or to subject any particular person, company, firm, corporation or locality, or any particular freight traffic, to any undue or unreasonable prejudice or disadvantage in any such respect whatsoever   *   *   *   ."

According to the title of the act, one of its objects was to insure an adequate railway service. Such service is not limited to freight traffic, but embraces the transportation of both passengers and freight. That it was clearly the intention of the legislature to make the provisions of the act applicable to both freight and passenger traffic, is made clear by section 1, which states: "That the provisions of this act shall apply to any corporation or to any person or persons who shall be held to be common carriers within the meaning and purpose of this act, and to any common carrier or carriers engaged in the transportation of passengers or property by railroad from one point or place within the state to any other point or place within the state." By section 2 of the act, although somewhat ambiguous on the subject, we think it is made the duty of a railroad company to furnish, upon reasonable request, sufficient cars for the transportation of passengers and establish through routes for that purpose. This view is strengthened by the next section, which states that "All charges made for any service rendered or to be rendered in the transportation of passengers or property, as aforesaid, or in connection therewith, shall be just and reasonable," thus manifesting an in-

tention on the part of the legislature, in connection with the declaration in section 1, to the effect that the act applies to carriers engaged in the transportation of either property or passengers, to exercise a reasonable control over a railroad with respect to the transportation of passengers. By section 5 as above noted, a railroad company is inhibited from subjecting any locality to any undue or unreasonable disadvantage. By section 12, authority is conferred upon the commission to execute and enforce its provisions. If the company, by operating its passenger trains, or refusing to operate them, over a portion of its road, brings about a result which the law inhibits, then it is not only violating the law, but imposing upon a community a disadvantage which the act intended to prevent. The fact that passengers from Breckenridge to Denver must travel to Leadville, and thence to Denver over the Denver & Rio Grande via Pueblo, or over the Colorado Midland via Colorado Springs, and in returning, travel the same circuitous route, a distance in the one case of 317 miles, and in the other of 253 miles, when the distance over the direct line of the South Park is but 110 miles, and that by traveling over these routes to and from Denver, they must pay additional passenger fares, and suffer loss of time, much in excess of that required when the line between Como and Breckenridge was operated, or that persons at Breckenridge, desiring to reach Como by rail, would have to travel to Denver over one or the other of the lines indicated, and then from Denver to Como, a distance, in all, of several hundred miles, in order to reach a point but twenty-one miles distant, manifestly subjects Breckenridge to an unreasonable disadvantage, which is the direct result of the railroad company abandoning that portion of its road between Como and Breckenridge. With the act expressly inhibiting a railroad company from subjecting a locality to an undue disadvantage, and with express authority conferred upon the commission to enforce the provisions of the act, we think it has power to direct the railroad company

to operate passenger trains over its line to Denver, so that the disadvantage imposed upon the inhabitants of Breckenridge by the railroad company abandoning its line between that point and Como will be removed, provided, of course, the company can not justify its action in abandoning that portion of its road.

The first railroad commission act was passed in 1907—Laws 1907, p. 531. By section 11 of that act, the governor was empowered to appoint three commissioners to serve until January, 1909. This section further provided that at the general election in 1908, three commissioners should be elected, one for the term of two years, one for four years, and one for six years, for terms beginning in January, 1909. At the general election in 1908 Commissioners Anderson and Staley were elected for the respective terms of six and four years. At the general election in 1910, Commissioner Kendall was elected for the term of six years, from January, 1911. These gentlemen, by virtue of these elections, constituted the railroad commission when the proceedings were commenced which afterwards resulted in the case now under review, being instituted in the district court, and also at the time that case was commenced and judgment entered.

In 1910 the general assembly, at a special session, passed the railroad commission act now in force. By its terms it purported to amend, and as amended, to re-enact the act of 1907. Section 28 of the new act recites: "All acts and parts of acts inconsistent herewith, are hereby repealed. All parts of the act hereby amended and not re-enacted in this act, are hereby repealed." By section 11 of the new act, it was provided: "That a commission is hereby created and established, to be known as "The State Railroad Commission of Colorado," which shall be composed of three commissioners who shall hereafter be appointed by the governor, by and with the consent of the senate, provided that the three commissioners who were elected in November, 1908, shall be the commissioners hereunder for the terms for which they were elected;

that is to say, Worth L. Seeley shall be a commissioner to serve until the second Tuesday in January, 1911, Daniel H. Staley shall be a commissioner to serve until the second Tuesday in January, 1913, and Aaron P. Anderson shall be a commissioner to serve until the second Tuesday in January, 1915." Section 1 of the act of 1907 exempted from its operation mountain railroads operating less than twenty miles of road, the principal traffic of which was the hauling of mineral from, and supplies to, mines.

Under these provisions it is contended (1) that the act, on account of exempting mountain railroads of the character mentioned, is in violation of the constitution of the United States, which forbids any state to deny any person the equal protection of the laws; and (2) that as commissioners were elected under the act of 1907, they are without authority to enforce its provision if the act is unconstitutional: (3) that inasmuch as the act of 1910 repealed all parts of the original act not re-enacted, Kendall's election was invalid; (4) that by the act of 1910, it was provided that the commissioners should thereafter be appointed by the governor, by and with the consent of the senate, and that the proviso to which we have referred under which Commissioners Anderson, and Staley, were continued in office, is invalid, for the reason that the legislature is without power to create an office not connected with the legislature itself, and in the same act designate the person who shall fill that office.

The constitutionality of the act of 1907 is settled by the decision of this court in the *Consumers' League case, supra,* and it is unnecessary to discuss that question here. This conclusion renders it unnecessary to consider the second proposition.

The validity of Commissioner Kendall's election is settled in *Kendall v. People,* 53 Colo. 106; 125 Pac. 586, and is no longer open to question.

The fourth proposition is clearly without merit. It is true, that the act of 1910 provides that the members constitut-

ing the railroad commission should be appointed by the governor, but it expressly exempted from its operation Commissioners Anderson and Staley, by declaring that they should continue in office under their election until the terms for which they were respectively elected expired. By so doing, the legislature did not, as contended, create an office, and in the same act designate the persons who should fill it, for the very obvious reason the act simply provided, so far as Commissioners Anderson and Staley were concerned, that the governor, although empowered to appoint the railroad commissioners, instead of being elected, as the act of 1907 provided, should not exercise that power as to these two commissioners until their respective terms for which they had been elected had expired.

The next point urged by counsel for plaintiff in error for us to consider is to the effect that if the act of 1910 confers upon the commission authority to make the order involved, then the order is an exercise of legislative power on the part of the commission, and is unconstitutional and void. Our state constitution inhibits the delegation of legislative power to a body like the railroad commission—art. 3; art. 5, sec. 1, and the amendment to sec. 1, Laws 1910, p. 11.

Section 27 of the railroad commission act empowers the commission to make such orders with respect to increased facilities as in their judgment may be necessary and within the reasonable power of any common carrier to adopt for the convenience of the public, in handling property, and to "make such reasonable order requiring any common carrier to do any such thing deemed by the commission to be proper, in respect to such matters within a reasonable time, to be fixed by the commission as to them shall seem so necessary, and so within such reasonable power of such common carrier." In support of the proposition under consideration, it is urged that the law does not specify what increased facilities shall be furnished by a common carrier, that it does not direct trains to be run daily, or that all parts of a line shall be operated;

or that trains shall move at any particular time, and that whatever is necessary with respect to these matters, is not determined by the law, but rests in the judgment of the commission. In other words, the contention is, that the duties imposed upon a common carrier do not exist until the commission makes an order, and that the extent of the duty of a carrier and whether it exists or not, arises wholly out of the order of the commission. In determining this proposition, there are other portions of the act which should be considered.

By section 2, a common carrier is required to furnish cars to shippers, and to fix reasonable time schedules for trains. By section 5 a common carrier is inhibited from giving any particular locality an undue advantage, or to subject any locality to an undue disadvantage. By section 25 a railroad company is required to transport shipments with the utmost diligence; and by section 12, a commission is created, with authority to execute and enforce its provisions. It is true, the time within which, or the number of trains that shall be run, or the equipment of trains, has not been specified in the act in detail; but the purposes of the act in imposing the duties upon common carriers to which we have referred, was to compel them to furnish an adequate railway service. To this end power is conferred upon the commission to execute the law. The general assembly has passed the law, but it has not conferred upon the commission the power to make or unmake the law, in any respect. That body is merely charged with the administration of the law by directing in a proper case what equipment shall be supplied, what trains shall be run, and what other requirements expressly or impliedly imposed on common carriers they shall perform and observe in scribed; so that the authority of the commission is limited to administering the law prescribed by the legislature, by ascertaining, as a fact, whether its provisions are violated, and if violated, to enforce them. This is in no sense the exercise of

a legislative power; but its purpose is to afford a means to aid in carrying the law into effect.—C. & N. W. Ry. Co. v. Dey, 35 Fed. 866; 2 Wyman on Public Service Corporations, sec. 1403; C., B. & Q. R. R. Co. v. Jones, 149 Ill. 361 (378); State v. R. R. Co., 38 Minn. 281.

In other words, while it is true the general assembly can not delegate the power to make a law, it may, however, make a law delegating the power to determine some fact or a state of things upon which the law, as prescribed, makes its action depend.

On behalf of plaintiff in error it is urged:

(1)  That its charter is permissive, and does not require it to operate and maintain an unproductive line.

(2)  That the order of the state railroad commission, directing the operation of through freight and passenger trains between Denver and Leadville, impairs the obligation of contract, in violation of the constitution of the United States, art. I, sec. 10, and the constitution of Colorado, art. II, sec. 11.

(3)  That the order of the commission takes the property of the plaintiff in error without due process of law, and denies it the equal protection of the law, in violation of the fourteenth amendment to the constitution. These propositions can be considered together, as they involve, to a considerable extent, a consideration of the same propositions of law and fact.

In support of the proposition that the charter of the railroad company is purely permissive, and that the company can not be compelled to operate an unproductive line, the following constitutional provisions and statutes are relied upon:

Art. XV, section 3, of our constitution, provides, in substance, that the general assembly may alter any charter of a corporation thereafter created, when, in their opinion, it may be injurious to the citizens of the state, but only in such manner that no injustice shal be done to the incorporators. Section 4 of same article provides that railroads shall be public highways, and that any corporation organized for the purpose shall have the right to construct and operate a railroad

between any designated points within this state. Section 6 of the same article provides that all individuals and corporations shall have equal rights to have persons and property transported over any railroad in the state, and that no undue or unreasonable discrimination shall be made in charges or in facilities for transportation of freight in this state.

Section 599 Mills' Stats. provides that five or more persons may form a company for the purpose of constructing a railroad, and that their certificate of incorporation, among other things, shall state:

"First: The place from and to which it is intended to construct the proposed railway."

"Second: The time of the commencement and the period of the continuance of such proposed corporation."

Section 602 *ibid* provides that such corporation shall have the power:

"First: To lay out its road, not exceeding two hundred feet in width and to construct the same    *    *    *    ."

"Fourth: To receive and convey persons and property on its railway.

Fifth: to erect and maintain all necessary and convenient buildings and stations, fixtures, and machinery for the convenience, accommodation and use of passengers, freights, and business interests, or which may be necessary for the construction or operation of said railway.

Sixth: To regulate the time and manner in which passengers and property shall be transported, and the compensation to be paid therefor."

By the next section it is provided that if any railway corporation shall not, within two years after its articles are filed and recorded, begin the construction of its road, and expend twenty per cent of the amount of its capital within five years after the date of its organization, its corporate existence and powers shall cease.

By section 614 *ibid* it is provided that where the property and franchises of any railroad company organized and exist-

ing under the laws of this state shall be sold and conveyed under any power contained in any trust deed or mortgage, or pursuant to the judgment or decree of any court of competent jurisdiction, it shall be lawful to organize a railroad company under the laws of this state for the purpose of purchasing, maintaining and operating the property so sold and conveyed.

By the section following it is provided that the railroad company so organized shall have power to acquire the property and franchises sold and conveyed, as contemplated in the preceding section, and to enjoy all the estate, franchises, rights, powers and privileges in law or equity of the corporation whose property and franchises have been so sold.

By section 632 *ibid* provision is made for a railroad company, upon a vote of two-thirds in value of its stockholders, at any meeting thereof, to amend its articles of association, so as to change its termini, and when so determined, to amend or alter its articles of association, such amendments, when filed in the offices where they are to be recorded, shall have the same force and effect as though such amendments had been included in and made a part of, and embraced in the original articles of incorporation.

By section 3703 *ibid,* authority is conferred upon a railroad company to make a new location of its line, and that where such location is made, the previous right of way shall revert to the owner of the land through which such right was granted, on payment to the railroad company of the amount assessed by the board of appraisers and paid by the railroad company for its previous right of way.

The plaintiff in error was organized in 1898, and in 1899 purchased the narrow gauge lines exhibited on the map at a sale ordered under foreclosure proceedings against The Denver, Gunnison & Leadville Railway Company, the former owner of this property.

The alleged impairment of the obligations of a contract by the order of the commission, in directing the operation of through freight and passenger trains is based substantially

upon the statutory provision above noted, to the effect that a railroad company, organized under the laws of this state, has the power to regulate the transportation of both passengers and freight, and compensation therefor, and the constitutional provision that in changing the charter of a corporation injustice shall not be done to the incorporators.

The third proposition is based substantially upon the ground that the order of the railroad commission cannot be complied with except at a heavy loss to the company.

The testimony shows that the grades between Breckenridge and Como are steep, the curves sharp, and that by reason of the high altitude between these points which, in places, is above timber-line, the operation of the road between Breckenridge and Como is expensive, for the reason that a locomotive can only handle a light tonnage; and that in the winter snow must be shoveled from the track which at times accumulates to such an extent as to stop traffic for a considerable time.

On the subject of losses incurred in operating the entire South Park system for several years prior to 1902, elaborate tables are submitted, from which it appears the loss has been great. The same result appears from the operation of the road between Como and Leadville, and Breckenridge and Leadville. In computing losses, taxes and interest on bonds and investments are charged, although eliminating these items, the tables mentioned show a loss. Our attention is not directed to any testimony from which it is made to appear what losses (if any) the company would suffer in operating trains between Breckenridge and Como, in compliance with the order, above that which it now claims to suffer in operating its line from Breckenridge to Leadville. The company does not claim a loss will be incurred in operating trains as directed by the commission, because they are not necessary to accommodate the freight and passenger traffic from Breckenridge to Denver.

The evidence establishes that for the years 1906 to 1911, both inclusive, the net earnings of the company on its entire

system ranged from $1,897,000 to $2,876,000, and that during this period the following dividends were paid: 1906, $340,000; 1907, $680,000; and that for each of the years 1908 to 1911, inclusive, $1,300,000.

Breckenridge has a population of over eight hundred. We have already called attention to the inconveniences and expenses imposed upon the people of Breckenridge and vicinity resulting from closing the road between that point and Como. As we understand the record, the rates charged for freight shipped to Denver under the arrangement by which the railroad company handles that traffic via Leadville over the Denver & Rio Grande are the same as previously charged when transported over the South Park from Breckenridge to Denver. Passengers from Breckenridge to Denver, however, must pay an additional charge proportionate to the increased distance they travel in going via Leadville, as compared with the distance between Breckenridge and Denver over the South Park line. The time consumed is much greater, by many hours, than it would be by going direct over the South Park. In addition, the people of Breckenridge, in some instances, at least, must pay express rates on perishable merchandise, instead of freight rates, as before.

In support of the contention on the part of plaintiff in error that the judgment of the district court is erroneous, when tested by the several propositions under consideration, it is urged that the right to build and operate a railroad in this state is purely permissive; that the statutes do not impose any obligation upon a company owning such road to operate it at a loss; that when the plaintiff company was organized, the statute empowering railroad companies to regulate the time and manner in which passengers and property should be transported over their lines and the compensation to be paid therefor, was in force; that this section was, in effect, a part of its charter; that to now require the company, either by virtue of the railroad commission act or the order of the commission, to operate trains in accordance with such order de-

prives it of a contract right; that this cannot be justified under the authority vested in the general assembly to change the charter of a corporation, because a change is inhibited which will do an injustice to the incorporators; and that compelling the plaintiff in error to operate its road between Leadville and Denver at a loss violates federal and state constitutional provisions, because thereby its property is taken without due process of law, and it is compelled to devote its property and revenues to a public use without compensation.

In considering these several questions, the first important question of fact to determine is, whether or not the record discloses that a compliance with the order of the commission subjects the company to a substantial loss. In considering this question, it should be borne in mind the company does not claim that the trains directed by the commission are not necessary to accommodate the freight and passenger traffic between Breckenridge and Denver, but bases its right to be excused from complying with the order upon the ground that to operate the trains ordered causes a loss which it should not be required to suffer, when a freight and passenger service is provided via Leadville. The company claims that the operation of its trains from Breckenridge to Leadville entails a loss. The record does not disclose what loss, if any, would be caused by operating trains between Breckenridge and Como in compliance with the order of the commission, above that which the company now claims to suffer by operating its line between Breckenridge and Leadville. With trains, both freight and passenger, only operated between Breckenridge and Leadville, it is fair to assume that the company only receives a portion of the freight and passenger charges which shippers from Breckenridge to Denver, and passengers to and from the same points, must pay for transporting freight and as passenger rates; and that if the order of the commission were complied with, the company would receive the entire revenue derived from both passenger and freight traffic between Breckenridge and Denver, in place of the portion it now receives for han-

dling this traffic from Breckenridge to Leadville.   Manifestly, the change in the operation of its road as ordered by the commission would increase the revenue of the company, as it would thus receive on both the freight and passenger traffic between Breckenridge and Denver the charges for such traffic over its own line for the entire distance between these points, instead of the amount which it receives therefor for the short haul between Breckenridge and Leadville.   This additional revenue might materially reduce the loss which the company now claims to sustain in operating its trains between Breckenridge and Leadville.   Clearly, if the company relies upon the ground that the order is unreasonable because a compliance therewith entails a loss, the burden is upon it to establish such loss as a fact.   This it has failed to do.

If, however, we assume the record discloses that a compliance with the order of the commission will entail a substantial loss, in excess of the revenues derived from the operation of the trains ordered, then we think that neither this fact nor any of the propositions to be considered in connection with it justify a reversal of the judgment.   In considering losses, we deem it pertinent to suggest that interest on bonds and investment should not be taken into account, as the amounts representing these items could not be materially different, whether the road was operated or not.   Taxes might be less on an abandoned road than one in operation.

It may be (but we do not so decide because not involved) that a railway company can not be compelled to build a projetced line.   That, however, is a radically different proposition from compelling it to maintain and operate a line which has been constructed in accordance with its charter and thereafter operated, but which it ceases to operate in order to reduce expenses.   It must be remembered that railways are corporations organized for public purposes, have been granted valuable franchises and privileges, and that primarily they owe duties to the public of a higher nature even than that of earning large dividends for their shareholders.—*United States*

*v. Trans-Missouri Freight Association,* 166 U. S. 290 (332). The franchise which plaintiff in error obtained by incorporating under the laws of this state was not granted for its profit alone, or that of its stockholders, but, in a large measure, for the benefit of the public, and while it is a private corporation, the public is interested in the business in which it is engaged in the capacity of a common carrier. In this capacity it is a public servant, and amenable as such.—*People ex rel. v. C. & A. Ry. Co.,* 130 Ill. 175.

It is undoubtedly true that a railway company, in the absence of a statute limiting its power, is vested with a wide discretion in operating its line of road; but this discretion is not absolute. It must be exercised with due regard to the welfare of the public.—*People ex rel. v. C. & A. R. R.; supra.*

At the time the plaintiff in error was organized and when it purchased the South Park system, the statute did grant it the right to regulate the time and manner in which passengers and property should be transported over the lines of that system; but this did not confer upon it the unlimited right to operate its trains as it saw fit, without regard to the interest of the public. This grant of power must be read in connection with the obligation which the law, independent of the statute, impliedly imposed upon it to so operate its trains and furnish such service as would reasonably serve the needs of the public. The right of a state to reasonably control a railroad company in the operation of trains, within its jurisdiction, will not be considered as having been surrendered either by statute or constitutional provision, in the absence of positive words to that effect, or their equivalent in law. There is nothing in either the statutes or the constitution of the state to indicate the intention to surrender such control; so that simply granting to a railroad company the right to fix the manner of running its trains does not deprive the state of its power to act upon the reasonableness of its action in this respect.—*Railroad Commission case,* 116 U. S. 307. The con-

stitution of the state inhibits the general assembly from so changing the charter of a corporation as to work injustice to the incorporators; but in our opinion this provision is not applicable. Merely requiring the railroad company to observe the obligations which the law imposes upon it to reasonably serve the public, by either the terms of the Railroad Commission Act or the order of the commission, by virtue of the authority vested in them, is nothing more than requiring it to comply with its legal obligation. This does not invade any constitutional right, neither does it work an injustice to the incorporators.

As previously stated, the railroad company does not claim that the service ordered is unnecessary, except upon the ground that operating its trains between Breckenridge and Leadville affords a service which ought to excuse it from complying with the order of the commission. We have called attention to the fact that refusing to obey the order of the commission subjects the people of Breckenridge and vicinity to great inconvenience, pecuniary loss, and loss of time; and this brings us to a consideration of the question of whether or not compelling the railroad company, under these circumstances, to operate its trains between Leadville and Denver, by resuming the operation of its line between Como and Breckenridge, at a substantial loss, deprives it of its property without due process of law, and requires it to devote its property to a public use without compensation. Unquestionably, railroad property is protected by constitutional guaranties, but these rights are not abridged by being subjected to reasonable governmental power of regulation.—*Mo. Pac. Ry. Co. v. Kansas,* 216 U. S. 262. The consideration for the franchise, rights and privileges granted a railroad company by a state is the resulting benefits to the public, and the acceptance by the company, generally speaking, imposes upon it the obligation to operate, when constructed, the railroad it was incorporated to construct, and of doing so in the manner and for the purpose contemplated by its charter.—*State ex*

*rel. Grinsfelder v. Street Ry. Co.,* 19 Wash. 518; *People ex rel. v. C. & A. R. R. Co.,* 130 Ill. 175; *Gates v. Boston R. R. Co.,* 53 Conn. 333; 33 Cyc. 635.

One of the obligations thus imposed, as we have said, is to so operate its trains as will reasonably serve the needs of the public. Applying these propositions to the case at bar, it follows, that plaintiff in error, by organizing for the purpose of purchasing the South Park system, and purchasing it, was granted and accepted a franchise for the benefit of the public, which obligated it to operate the road it purchased in such manner as to reasonably accommodate the public. At the time it purchased the South Park system it purchased other lines, as stated in a former part of this opinion. It operated, or heretofore has operated, all these lines as one system, under one general management and control. They are in no sense separate or independent. It appears, as previously stated, that the operation of its entire system has resulted in net returns aggregating large sums, for each of the six years previous to the date the action was instituted before the commission, and that during that period it has paid its stockholders, annually, large sums in the way of dividends. It has not surrendered its franchise, and continues in the enjoyment of all its corporate rights. It does not claim that the service ordered is more than sufficient to accommodate the traffic between Denver and Leadville. In such circumstances, the question of loss must be considered in connection with its duties and the productiveness of its corporate business as a whole. The law imposes upon it the duty of furnishing adequate facilities to the public on its entire system, not a part; and it cannot be excused from performing its full duty merely because, by ceasing to operate a part of its system, the net returns would be increased; so that it cannot be said, under the facts, that requiring plaintiff in error to perform its duty to the public by furnishing an adequate service over its line between Denver and Leadville, although a pecuniary loss is entailed, is unreasonable or deprives it of any constitutional

right, either federal or state.—*Mo. Pac. Ry. Co. v. Kansas,* 216 U. S. 262; *Atl. Coast Line R. R. Co. v. N. C. Corp. Com.,* 206 U. S. 1; *Corporation Com. v. R. R.,* 137 N. C. 1.

In brief, under the facts of the case at bar, an order requiring a railroad company in the possession and enjoyment of its charter powers and privileges, to furnish a necessary service does not, even though a compliance with the order entails a loss, deprive it of its property without due process of law, or compel it to devote its property and revenues to a public use without just compensation, for the obvious reason that such an order merely requires it to discharge its legal obligations. Of course, that a service ordered will entail a loss is a circumstance to consider in determining the reasonableness of the order; but a common carrier cannot successfully complain that a loss will thus be occasioned when it appears that the ordered service requires nothing more than necessary transportation facilities.

In the *Missouri Pacific* case, *supra,* a writ of error was prosecuted to the judgment of the supreme court of Kansas; directing the railroad to obey an order of the railroad commission of that state, requiring the company to furnish an exclusive passenger service on one of its branches in lieu of a mixed train service. There, as here, the company attacked the validity of the order upon the ground that a compliance with it would result in a pecuniary loss in that the expense of furnishing an exclusive passenger train service would exceed the revenues derived from such service. The company contended that compelling it to suffer such loss invaded its constitutional rights. The supreme court held that so long as the company was in the possession and enjoyment of its charter powers, it was its duty to furnish adequate facilities for transporting passengers, and that requiring it to perform a service in this respect, which was not unreasonable, although such performance would entail a loss, did not deprive the railroad company of its property without due process of law, or result in the taking of its property for a public use without compen-

sation, for the reason that such order was nothing more than requiring it to do that which it was essentially its duty to perform. In speaking to this point, the court quoted with approval from the *Atlantic Coast Line* case, *supra*, where it was said: "Of course, the fact that the furnishing of a necessary facility ordered may occasion an incidental pecuniary loss, is an important criteria to be taken into view in determining the reasonableness of the order; but it is not the only one, as the duty to furnish necessary facilities is coterminous with the powers of the corporation. The obligation to discharge that duty must be considered in connection with the nature and productiveness of the corporate business as a whole, the character of the services required, and the public need for its performance." In considering further the duties imposed upon a railroad company to furnish adequate transportation facilities, the court, speaking through Mr. Justice White, said: "But where a duty which a corporation is obliged to render is a necessary consequence of the acceptance and continued enjoyment of its corporate rights, those rights not having been surrendered by the corporation, other considerations are, in the nature of things, paramount, since it cannot be said that the order compelling the performance of such duty at a pecuniary loss is unreasonable. To conclude to the contrary would be but to declare that a corporate charter was purely unilateral, that it was binding in favor of the corporation as to all rights conferred upon it, and was devoid of obligation as to duties imposed, even although such duties were the absolute correlative of the rights conferred."

Counsel for plaintiff in error cite many authorities in support of their contention that the charter of the company is permissive, that the order of the commission impairs the obligation of contract and deprives the company of property without due process of law, which we do not deem it necessary to review, as, in our judgment, the cases cited, in connection with those cited from 116, 206 and 216 U. S., sustain our conclusion, that neither of these propositions is tenable.

In our opinion, the law and the facts fully justify the order of the commission and the judgment of the district court, directing the company to obey it, and that judgment will, therefore, be affirmed.                    *Judgment affirmed.*

Decision *en banc.*

Mr. JUSTICE HILL not participating.

Decided December 9, A. D. 1912.    Rehearing denied January 6, A. D. 1913.