Johnson, J.
The judicial article of the constitution, as recently amended, after defining the original and the appellate jurisdiction of this court, provides that it shall have “such revisory jurisdic *14 tion of the proceedings of administrative officers as may be conferred by law.” ■
Section 33 of the act of April 18, 1913 (103 O. L., 804), to create the public utilities commission, provides in effect that such jurisdiction may be invoked by petition in error, and that a final order of the commission shall be reversed, vacated or modified if the court is of opinion that the order was unlawful and unreasonable. In order to give full validity to the proceedings and orders of the utilities commission, it was necessary that some adequate provision for their judicial review should be made; because if an administrative order results in the taking of property, such as the company claims results in this case, the defendant must not be denied the right to show that as matter of law the order was so arbitrary, unjust or unreasonable as to amount to a deprivation of property in violation of the constitution. Chicago, M. & St. P. Ry. Co. v. Minnesota, 134 U. S., 418.
The legislature is not required to -confine such revisory jurisdiction to this court, but would be authorized by Section 4 of Article IV of the Constitution to confer it on the courts of common pleas. By the provisions of the public utilities act all of the powers of the public service commission are conferred on its successor. Full provision is made in Section 524 et seq., General Code, for notice to the defendant of the filing of the complaint and of the time and place of hearing. Full opportunity is given it to be heard and to show that the order asked for is unlawful or unreasonable. It has the benefit of. compulsory process to *15 require the attendance of witnesses to testify under oath and to secure the production of documents. Provision is made for the taldng of depositions and for a certified transcript of all the evidence, findings and orders. On petition in error here it leaves for consideration the contention that the record shows that the order of the commission was unlawful or unreasonable.
The court in Oregon Rd. & N. Co. v. Fairchild, 224 U. S., 510, 528, where a similar administrative order was under consideration, say: “This necessitates an examination of the evidence, not for the purpose of passing on conflicts in the testimony or of deciding upon pure questions of fact, but, as said in Kansas City Railway Co. v. Albers Commission Co., 223 U. S., 573, from an inspection of the ‘entire record, including the evidence, if properly incorporated therein, to-determine whether what purports to be a finding upon questions of fact is so involved with and dependent upon such questions of law as to be in substance and effect a decision of the latter,1’ ”
Various grounds are set out in the petition in error in this case on which it is claimed that the orders complained of are unlawful and unreasonable. They are comprised in the contentions of the company hereinafter referred to. It is urged that the findings and orders are against the manifest weight of the evidence. The findings, as shown by the entry of the commission, are: That the defendant has, since 1896, operated electrically propelled cars and furnished an interurban passenger service to the public over its leased properties be *16 tween Jackson and Hamden, Ohio, a distance of about fifteen miles, and at the time of the filing of the complaint said service was being rendered substantially on the schedule set out therein; that by reason of the establishment and maintenance of said service by defendant, large numbers of individuals, firms and corporations were influenced in the establishment, location, maintenance and operation of their business enterprises, and the personal and business relations of the various communities, individually and with each other, were and have become and are now adjusted to and in accordance with the service so furnished; that public convenience, welfare and necessity require that defendant continue to furnish the service; that the defendant has not shown that the furnishing of the service would entail any financial loss upon it or that the service has not been, or will not be, remunerative.
We have carefully examined all of the evidence and considered it in the light of the conflicting claims of the parties with reference to it, and we are not able to say that the findings of the commission are against the evidence.
It is clearly shown that during the eighteen years while the service was continued, the personal and business relations of the communities served became adjusted in the manner set forth.
It is conceded by counsel on both sides that the order made by the commission does not require that the interurban service be maintained by means of electricity. No particular motive power is made the criterion of compliance by the defendant with *17 the order of the commission. The question of motive power is thus left for the determination of the defendant itself. Therefpre, the only question left relates to the validity of the order requiring the company to furnish interurban service. The defendant contends that the regular steam-train schedule between the points named will supply all the needs of the community and that to operate interurban service would be a source of constant and increasing financial loss to it. Its position is that it will have performed its duty when it shall install a service of cars which will furnish transportation facilities equal to that provided by it on any other of its lines in the state, and that the order of the commission requires the defendant to discriminate unlawfully and unreasonably in favor of the points named.
As to the sufficiency of the proposed substitute service, the witness Sellers, whose testimony disclosed that he was well acquainted with the entire situation, testified that it would depend on the nature of the service and whether the substituted service would make stops of the character that were made by the already established service. To the same effect was other evidence in the case.
It is important that an adequate conception should be had of the meaning of the term “interurban service.” It is obvious that the commission used the term as meaning a service consisting of cars or trains which are run more frequently than any through steam-passenger service, and also a service in which frequent stops are made, so that *18 patrons need not walk far along the line to arrive at the nearest stopping place. Such a service is to be distinguished from the ordinary passenger trains of steam railroads in that the latter do not stop except at regular stations located in cities or villages, which are at intervals much greater than the stops which the evidence shows were made by the defendant on the portion of its line involved in this proceeding. The question is, therefore, presented whether, in view of the fact that the personal and business relations of these communities had become adjusted, to the kind of transportation service known as interurban service as distinguished from ordinary steam service, all of which had been done by residents in those communities, who had relied upon the fact that the defendant had voluntarily entered the field and had offered to furnish and had furnished the particular service referred to, the defendant can now withdraw or discontinue the service, while still retaining its corporate franchises and rights, without itself assuming the burden of making a showing- of facts which justify the withdrawal or discontinuance. It is a matter of common knowledge that the business and personal relations of the people of the country necessarily become adjusted to its transportation facilities, and that these constitute a very important factor in determining the direction and scope of the development of particular sections.
It is not shown that there is any special franchise provision or any contract by which the defendant expressly agreed to render the service in question. Therefore, the order of the commission must find *19 its validity, if at all, by reason of the fact that the defendant is a public utility, incorporated and organized under the laws of the state, and that while exercising the rights and privileges accruing to it as such, it has by its acts and conduct created the situation found by the commission to exist; and that from this situation a duty is imposed upon it which it cannot disregard in the absence of such a showing on its part as above indicated.
It is well established that the benefits which result to the public constitute the consideration for the grant by the state of the franchises, rights and privileges held and exercised by a railroad company, and that their acceptance by the company imposes on it the obligation to operate the railroad which it was incorporated to construct, when constructed, and of doing so in the manner and for the purposes contemplated in its charter. One of the obligations thus imposed is to so operate its trains that they will reasonably serve the needs of the public.
The court in Atlantic Coast Line Rd. Co. v. N. Car. Corp. Commission, 206 U. S., 1, said: “The elementary proposition that railroads from the public nature of the business by them carried on and the interest which the public have in their operation are subject, as to their state business, to state regulation, which may be exerted either directly by the legislative authority or by administrative bodies endowed with power to that end, is not and could not be successfully questioned in view of the long line of authorities sustaining that doctrine.”
*20 In Gates v. Boston & N. Y. Air Line Rd. Co., 53 Conn., 342, it is said: “It is true that the charter is permissive in its terms, and properly no obligation rests upon the corporation to construct the railroad * * * when that option has been made, and the corporation * * * has commenced to operate the road under the granted powers, thereby inducing the public to rely, in their personal and business relations, upon that state of affairs; by so accepting and acting upon the chartered powers a contract exists to carry into full effect the objects of the charter. * * * Having exercised these powers the corporation has no right against the will of the state to abandon the enterprise.”
The defendant, however, contends substantially that in spite of the state of facts shown in the record, as to the adjustment of the community relations to the service, the conditions in the communities had so changed at the time the complaint was filed that the present needs do not require that the service be maintained; that electric service, considered as a separate operation, is conducted at a loss and that the enforced continuance of the service would be a discrimination against other communities served by the defendant which would not enjoy similar advantages. Defendant offered testimony tending to show that it would be necessary to install new equipment at considerable expense, which could be operated only at a loss if it is required to continue the electric service.
So far as the matter of the electric service is concerned, that is eliminated by the concessions of *21 counsel on both sides that such service is not required by the order of the commission. So far as the changed conditions and the lessening demands are concerned, the witness Connors, called by the defendant, testified that there had been a decrease in the number of passengers, but was not able to give the extent to which this had gone. He stated that it was true, in a general way, but said “I haven’t the figures, but if estimates will answer I can give an estimate, if not I will get the figures.” It was then suggested by a member of the commission, which suggestion was agreed to by the witness, that a detailed statement showing the condition in relation to the traffic, which would disclose the facts with reference to the matter testified to by the witness, should be produced. Counsel for the commission state in their brief and at the bar that the statement was never furnished and that the general statement by Mr. Connors was all the testimony touching the subject, and we find no denial of that statement in the brief of opposite counsel. We have not found in the record anything to contradict this claim.
It is undoubtedly true that the question whether or not the interurban service is a paying service should be considered with respect to its bearing on the question whether the public necessities require such service. The presumption is that where there is such a condition and such demand for the service as to amount to public necessity, the rendering of the service would not result in loss. The finding of the commission was that the defendant had not shown that the furnishing of the service will entail *22 loss upon it, and the finding was that the public convenience, welfare and necessity require the continuance of the service.
Much testimony was offered touching this question, and, as already indicated, we are not able to say from an analysis of it that the finding- of the commission was not sustained by the evidence.
Under the state of facts shown by the testimony and found by the commission the presumption is that there is a present necessity for the continuance of the service which has been in existence for about eighteen years, in the absence of a showing by the defendant to the contrary.
In Colorado & Southern Ry. Co. v. Railroad Commission, 54 Colo., 64, the company discontinued the service over a certain division, about sixteen miles in length, on the ground that because of heavy grades and curves operation of trains was attended with severe loss. On the other hand, it appeared that deprivation of this service inflicted greater loss on the people of the community affected. On this point the court say: “At the time it purchased the South Park System it purchased other lines * * * . It has not surrendered its franchise, and continues in the enjoyment of all its corporate rights. It does not claim that the service ordered [by the commission] is more than sufficient to accommodate the traffic between Denver and Leadville. In such circumstances, the question of loss must be considered in connection with its duties and the productiveness of its corporate business as a whole.” At page 94 of the opinion it is *23 said: “Of course, that a service ordered will entail a loss is a circumstance to consider in determining the reasonableness of the order; but a common carrier cannot successfully complain that a loss will thus be occasioned when it appears that the ordered service requires nothing more than necessary transportation facilities.”
In Atlantic Coast Line Rd. Co. v. N. Car. Corp. Commission, supra, the carrier was ordered by the commission to-arrange its schedule so that one of its passenger trains would make connections with a certain passenger train on another line at a given point. The company contended that on account of other connections made by the train in question that train could not be operated so as to make the required connection, and that thus the order would require the operation of an additional train. The company objected to this on the ground that the public convenience did not require the additional facility and, second, that it would entail a daily pecuniary loss.
It will be observed that in that case the requirement was that facilities additional to those already in existence be furnished, while here the order requires the maintenance of existing service or its equivalent. The court sustained the commission and held that its order was not inherently unjust and unreasonable because the running of Such train would impose some pecuniary loss on the company.
Mr. Justice White said: “This proposition is based on the hypothesis that the order, by neces *24 sary intendment, directed the Coast Line to operate an additional train, although such train could not be operated without a daily pecuniary loss. * * * The contention is that the fact that some loss would result from the requirement that the extra train be operated, in and of itself, conclusively establishes the unreasonableness of the order.”
After conceding that if a scheme of maximum rates was imposed by state authority, as a whole adequately remunerative, and yet that some of such rates were so unequal as to exceed the flexible limit of judgment which belongs to the power to fix rates, that is, transcended the limits of just classification and amounted to the creation of favored class or classes whom the carrier was compelled to serve at a loss, to the detriment of other class or classes upon whom the burden of such loss would fall, such legislation would be so inherently unreasonable as to constitute a violation of the due- • process and equal-protection clauses of the fourteenth amendment, the court further say: “Let it also be conceded that a like repugnancy to the constitution of the United States would arise from an order made in the exercise of the power to fix a rate when the result of the enforcement of such order would be to compel a carrier to serve for a wholly inadequate compensation a class or classes selected for legislative favor even if, considering rates as a whole a reasonable return from the operation of its road might be received by the carrier. Neither of these concessions, however, can control the case in hand, since it does not directly *25 involve any question whatever of the power to fix rates * * * but is concerned solely with an order directing a carrier to furnish a facility which it is a part of its general duty to furnish for the public convenience. The distinction between an order relating to such a subject and an order fixing rates * * * is apparent. This is so because as the primal duty of a carrier is to furnish adequate facilities to the public, that duty may well be compelled, although by doing so as an incident some pecuniary loss from rendering such service may result. It follows, therefore, that the mere incurring of a loss from the performance of such a duty does not in and of itself necessarily give rise to the conclusion of unreasonableness * * *. Of course, the fact that the furnishing of a necessary facility ordered may occasion an incidental pecuniary loss is an important criteria to be taken into view in determining the reasonableness of the order, but it is not the only one. As the duty to furnish necessary facilities is coterminous with the powers of the corporation, the obligation to discharge that duty must be considered in connection with the nature and productiveness of the corpo-. rate business as a whole, the character of the services required, and the public need for its performance.”
In Missouri Pacific Ry. Co. v. Kansas, ex rel., 216 U. S., 262, the principle announced in the Atlantic Coast Line case was reaffirmed. The Missouri Pacific case involved an order which directed the railroad company to run a regular passenger *26 train over its line instead of a mixed passenger and freight train. The company objected that the service could not be rendered without a loss. The court say: “When the controversy here presented is properly analyzed, the first and pivotal question arising is whether the order complained of did anything more than command the railroad company to perform a service which it was incumbent upon it to perform as the necessary result of the posses-sion and enjoyment of its charter powers.” It was also held that the order was not, even if such train is run at a loss, a deprivation of property without due process of law or a taking of property for public use without compensation, nor was such an order an unreasonable exercise of governmental control.
It must not be overlooked that a requirement, whether made by a statute or by the order of a commission, which denies a railroad company ' proper compensation for the carriage of passengers or freight, is entirely different from an order which compels the railroad company to perform duties to the public which are imposed upon it by reason of its exercise of the franchise, rights and privileges which it has acquired from the state.
We think it must be conceded that in a case of this character it would not be necessary for the defendant, in order to justify a withdrawal of the service, to show that such a service entails a pecuniary loss upon its railroad operated as a whole. There is a distinction between withdrawal from a service of this character and from such a *27 service as is offered to all other communities served by the carrier. Where there is a special service, such as the interurban service involved in this case, the loss, if it were shown on the particular operation, is entitled to consideration in the manner above indicated.
We are not constrained to think, however, that this rule should have conclusive effect in connection with the facts shown in this case. Here the public needs were created and grew up in view of the voluntary action of the defendant itself. The finding of the commission is that the public necessity still exists. An unusual and abnormal situation was developed under the lead of the defendant. The moving by the people away from central points to places scattered along the line of the defendant, and all of the things pointed out in the testimony and the findings, being done while the people relied upon the continuance of the voluntary service by the defendant, present a situation which clearly estops it from invoking the rule above stated.
Counsel for the railroad company urge that the case of Delaware, L. & W. Rd. Co. v. Van Sanwood et al., 216 Fed. Rep., 252, declares the principles which should rule this case. It was there held that where a railroad company discontinued two trains a day each way and was ordered by the service commission to restore them, and it appeared that the people residing in the terminal cities were amply served without it, the question of the right of the commission to order the trains restored depended on whether the convenience and *28 necessities of the residents of certain small intervening towns demanded the restoration and operation of the trains in question, and that where two steam trains a day each way were run, which reasonably served the convenience and supplied the reasonable necessities of four small intervening points, the residents of which also had the convenience of a through interurban trolley line, complainant would be considered as having performed its whole duty to the public and could not be compelled by the public service commission to operate two trains over the road each way per day at a net loss of over $3,000 per annum. After showing that a number of trains were run each day between the points named in the complaint, the gross receipts of each day and the existence of a trolley line between some of the points, the court recites the gross revenues of the defendant prior to the existence of the trolley line. It is said in the opinion : “It seems to' me that when steam trains enough are run between the city of Oswego and the city of Syracuse to accommodate and serve the necessities of the people of those cities and the intervening city of Fulton, and two steam trains per day each way are run which reasonably serve the convenience and supply the reasonable necessities of the four small intervening points, and these people also have the convenience of the trolley line as described, the complainant has performed its whole duty to the public.”
We think that the situation in this case is so substantially different from the situation described *29 by the court in the case referred to as to clearly distinguish it.
The order complained of will be affirmed.

Order affirmed.

Nichols, C. J., Wanamaker and Matthias, JJ., concur.
Jones, J., not participating.