JOSEPH H. DAVISON, APPELLEE, v. CHICAGO & NORTHWEST-ERN RAILWAY COMPANY, APPELLANT.

STEVEN E. DEXTER, APPELLEE, v. CHICAGO & NORTHWESTERN RAILWAY COMPANY, APPELLANT.

RAY H. McCORMICK, APPELLEE, v. CHICAGO & NORTHWEST-ERN RAILWAY COMPANY, APPELLANT.

FILED DECEMBER 9, 1916. Nos. 18946, 18947, 18948.

1. **Statutes: VALIDITY: FORMER ADJUDICATION.** A statute may be upheld as against an attack made by one party claiming it to be invalid upon one ground, and still it may be declared unconstitutional in a later attack by another litigant for reasons not called to the attention of the court, or not shown to exist, in the first case.

2. ———: ———: TRANSPORTATION OF LIVE STOCK. A statute or order regulating the rate of speed of the carriage of live stock is a proper exercise of the police power of the state, but such a statute or order must be reasonable, and practical in its operation, and it must not impose an undue burden upon the carrier, nor take away any of its constitutional rights.

3. ———: ———: ———. Where the undisputed evidence shows that for the greater portion of the year defendant, which operates a single-track railroad in Nebraska and other states, with several branch lines in this state, cannot comply with the speed law (Rev. St. 1913, secs. 6018, 6019) as to west-bound shipments of live stock

without sending out special trains on branch lines to transport from one to four or five cars, and at a cost of double the rates allowed to be charged, and it is further shown that on account of the ordinary incidents and vicissitudes of operation of a long single-track railroad, such as making up and inspection of trains at division points, waiting to meet mail, passenger and other trains, waiting for stock from branch lines, and those delays occurring by reason of storms, washouts, wrecks and other unforeseen and unavoidable casualties, it is often impracticable to come within the statutory limit with east-bound traffic, and the statute permits of no defense by reason of any of such conditions, such a statute is an unreasonable exercise of the police power of the state and violates the constitutional rights of the defendant.

APPEALS from the district court for Brown, Holt and Dawes counties: ROBERT R. DICKSON and WILLIAM H. WESTOVER, JUDGES. *Reversed.*

*A. A. McLaughlin, Wymer Dressler* and *Lyle Hubbard,* for appellant.

*A. W. Scattergood, M. F. Harrington, Hugh J. Boyle, W. K. Hodgkin* and *Earl McDowell, contra.*

LETTON, J.

These actions are brought to recover liquidated damages from a common carrier for failure to comply with the terms of the "speed law." Rev. St. 1913, secs. 6018, 6019. In the *Davison* case, which is to recover for delay in shipment of stock east-bound from Ainsworth to South Omaha, a jury was waived, the cause tried to the court, findings made, and a judgment rendered for the plaintiff for $935. The shipment in the *McCormick* case was of one car of cattle west-bound from South Omaha to Andrews, a distance of 469 miles. A verdict of $170 was directed. In the *Dexter* case delay was complained of in transporting three cars of cattle west-bound from south Omaha to O'Neill. A verdict was directed for $545. Defendant appeals in each case. The three causes were submitted together in this court and are illustrative of different conditions.

The petition in the *Davison* case contains 15 separate causes of action which are substantially alike. In sub-

stance, the first cause of action alleged is that on the 9th day of January, 1912, plaintiff delivered to defendant for shipment from Ainsworth to South Omaha a car-load of hogs; that the defendant unlawfully and negligently used 24 hours in transporting the hogs to South Omaha, when no more than 15 hours should have been taken, and thereby it became indebted to plaintiff at the rate of $10 an hour for 9 hours. The remaining causes of action cover like shipments upon different dates.

The answer alleges that the shipments were forwarded with due and proper dispatch. It also pleads that each shipment was necessarily delayed for the purpose of taking coal and water for the locomotive, for meeting west-bound trains, and permitting passenger trains going in the same direction to pass, for setting out and picking up empty cars and dead freight for stations through which the trains passed, for the purpose of inspecting, making up and rearranging trains at division and junction points, and for other purposes necessarily incident to the operation of trains; that a portion of the delay was occasioned by hot boxes and by extremely cold weather and storms, and that all were necessary in the operation of its railroad and for the service of the communities dependent upon it for railroad transportation.

It is further pleaded that defendant's road is a single-track railroad, part of a system extending into and through eight other states; that it was engaged in transporting both interstate and intrastate traffic from Ainsworth to South Omaha, carrying United States mail and passenger trains in both directions, and carrying live stock as interstate commerce from points in South Dakota and Wyoming to South Omaha and Sioux City and Chicago; that it is and was impossible to so operate its railroad as to move the stock shipments at the statutory speed without unreasonable interference and delay to west-bound interstate commerce and United States mail, and without giving preference to intrastate shipments of live stock eastbound; that the live stock offered in this state for trans-

portation to South Omaha is insufficient in quantity to enable it to run special trains therefor without great loss; that shipments of live stock from South Omaha to points on the various branches of defendant's lines in the state of Nebraska average less than five car-loads a day, and on many days no car-loads are offered for shipment; that the greater portion of the year only one or two car-loads are offered in any one day for such shipments, except during the months of September, October and November, when there is a general movement of stock cattle from South Omaha to the feeding yards along the line; that, after a train with such car-loads of live stock reaches Fremont, it is often necessary to divide it and send part of the live stock in small shipments over its branches; and that, in order to comply with the statutes, it will be necessary to run high-speed special trains to move small quantities of live stock, and thus give such trains a preference over freight from other states, thus interfering with interstate commerce. It is also alleged that numerous cities, towns and villages through which the train passes have enacted speed ordinances limiting the speed of trains, with which it is compelled to comply, and that, in order to comply with the statute, it will be required to move trains between stations at a dangerous rate of speed; that to transport live stock at the rate of speed required will involve an expense greatly in excess of the rate defendant is permitted to charge, and in excess of the amount the shipper can afford to pay and that the traffic will bear; that the enforcement of the statute would deprive it of its property without due process of law, and without just compensation, and would deny to defendant the equal protection of the laws, in violation of the Fourteenth amendment to the Constitution of the United States, and of the Constitution of the state of Nebraska. The reply was practically a general denial.

The findings of the court in the *Davison* case, on the first cause of action, summarized are: That the time necessarily consumed in setting out, loading and picking up

live stock was 15 minutes; in waiting for and meeting trains carrying United States mails, 1 hour and 36 minutes; in waiting for and meeting trains carrying interstate commerce 43 minutes; in taking coal and water, 1 hour and 59 minutes; in inspecting trains at division points for defects in safety appliances, 1 hour; in breaking up trains at division points, making up trains to go forward afterward, and waiting for stock from branch lines and from trains following, 40 minutes. The court refused to deduct any of the time of these delays, and found there was due on the first cause of action, at the statutory rate, $60 with 7 per cent. interest to date. Equally detailed findings were made for each of the other causes of action. The court further found that defendant's railroad in the state of Nebraska is, and was at the time complained of, a single-track railroad; that defendant is engaged in both interstate and intrastate commerce; that its system of railroads extends to and through the states of Illinois, Wisconsin, Michigan, Minnesota, Iowa, North Dakota, South Dakota, Nebraska and Wyoming; that the defendant now operates a sufficient number of west-bound trains on its railroad, including its main line and its branches in the state of Nebraska, and at a sufficient rate of speed, to adequately serve all communities on its said lines in Nebraska in the transporting of all kinds of inanimate freight; that, in order to transport live stock in a westerly direction from South Omaha to stations on the defendant's main line and branches in the state of Nebraska at the average rate of speed required by sections 6018, 6019, Rev. St. 1913, special trains must be operated, in addition to trains required for transporting other kinds of freight in each instance when live stock is tendered for transportation; that, except during a small portion of the year, the defendant could transport all live stock offered to it for transportation from South Omaha to stations on its line, in its trains regularly operated for the transporting of inanimate freight, if permitted to transport live stock at the rate of speed at which such regular trains can be operated; that de-

fendant is offered about 1,600 or 1,700 car-loads of live stock yearly at South Omaha for transportation to the various stations on its lines in Nebraska, and except during the months of August, September and October, when feeders are being moved from South Omaha to the feeding yards on defendant's lines, it rarely happens that more than three or four cars are offered to it for transportation on any one day; that South Omaha is the principal market for live stock shipped from stations on defendant's line of railroad in the state of Nebraska, and that substantially all the live stock offered to defendant for transportation in the state of Nebraska is destined either to South Omaha, or same is shipped from South Omaha to stations along defendant's line; that, in cases where more than one car of live stock is offered for transportation from South Omaha over defendant's line of railroad, the destination of such live stock may be such as to require a special train for each car-load before same reaches destination on account of destination of the various cars being on the various branch lines of defendant operated in the state of Nebraska. The court found that, in order to comply with the statute, special trains for live stock will be required to be operated at times in excess of those otherwise required, without decreasing the number of trains necessary for transporting other kinds of freight, including freight moving as interstate commerce.

The court refused to make the following findings requested by defendant: That a compliance with the speed statute would require the abandonment of safety precautions in the operation of its trains, and would tend to promote unsafe methods of operation, danger to the general public, and the violation of the speed ordinances, and would cause loss and damage to freight, passengers and employees; that the time necessarily consumed in waiting for and meeting passenger trains carrying United States mail, in meeting trains carrying interstate commerce, in taking coal and water, in inspecting trains at division points for defects in safety appliances, and in

Davison v. Chicago & N. W. R. Co.

breaking up trains, and making them up, and in waiting
for stock from branch lines or in a train following at such
points should be excluded; that the cost of transporting
live stock in compliance with the statute would be grossly
in excess of the revenue derived therefrom under present
tariffs, and in excess of the amount that shippers can
afford to pay, and that its collection of a compensatory
rate would destroy traffic in live stock to and from South
Omaha; and that the statute is unconstitutional as an
unreasonable exercise of the police power, or for any
other reason.

The affirmative findings of fact made by the trial court
are supported by the evidence, and their correctness is
not disputed by either party. The train sheets covering
the cars of stock offered for shipment and actually ship-
ped westward from South Omaha during the year 1910
are in evidence in the *Davison* case, and from these, to-
gether with the testimony of the train dispatcher, it is
shown that 1,616 cars were shipped west, mostly to Neb-
raska points; that there were four days in January when
only one car of live stock was offered for shipment west,
two days when two cars were offered, two days when three,
two days when four, two days when five, two days when
seven, one day when eight, and one day when nine cars
were shipped, being 63 cars in January. In February
there was an average of a little over two cars a day for
15 days; in March about five cars a day for 23 days were
offered. In September, October, November, and December
the number of shipments was largely increased; but, even
then, on only 9 days in the year did the number of cars
offered exceed 20. Even where the number of cars was
sufficient to make up a complete train, in most instances
it could only run a short distance before being broken
up, and the cars distributed to the Lincoln branch, the
Superior branch, Hastings branch, Albion branch, or other
branch lines. In the *Dexter* case it is shown that, in
1913, 1,591 cars of stock were shipped westward to Ne-
braska points and that for the years 1911 and 1912 the

traffic was about the same. For about eight or nine months of the year cars of stock which are offered for shipment at South Omaha to points in Nebraska are so inconsiderable in number that they cannot be moved within the time limited, except in special trains and at an excessive expense. Such cars on branch lines are placed in regular local freight trains which run according to a time table, and are scheduled so as to allow time for the delivery of local freight and merchandise at each station. This of itself makes the time consumed exceed the statutory limit.

It is also established that on account of unforeseen accidents and delays that sometimes happen to the train in which stock is shipped or to other trains which it is scheduled to meet, by reason of unavoidable delays incident to the business, such as wrecks, washouts, storms, cold weather, hot boxes, and the like, it is often impossible to move shipments of live stock east-bound within the limit. The time consumed on a single-track railroad in waiting at stations in order to meet mail and other trains, in taking coal and water, and time consumed at division and junction points, in inspection for defects in car appliances, and in breaking up the train and incorporating other cars brought from branch lines, are necessarily incident to the operation of the railroad. A number of these elements increases the delay with an increase in traffic on the road. It is also evident that, as the distance to South Omaha becomes less, the difficulties in transportation become greater on account of the congestion of traffic brought to the main line from branches. The testimony of the general superintendents in Nebraska of the defendant, and of the Chicago, Burlington & Quincy Railroad Company, and Union Pacific Railroad Company, and others concerned with the operation of trains, is substantially to the effect that, while it would be possible to comply with the statute, in many instances special trains would be required for a few cars, undue preference would require to be given to such traffic over other trains, the expense of operation would be so greatly increased that, in

order to cover the cost, tariff rates would require to be made double what they now are, and the rates be made prohibitive, and other trains and interstate business would be interfered with and delayed.

Defendant insists that if time necessarily occupied in taking coal and water, in taking side tracks to allow meeting and passing trains, in delays at division stations for inspection and rearranging cars, and those caused by severe storms, washouts, excessive cold weather, unforeseen and unavoidable accidents, and the like, could be added to the exceptions in the statute, its terms might be complied with. It insists that the time consumed in such necessary operations must of reason be exempted from the provisions of the statute—citing *United States v. Kirby,* 7 Wall. (U. S.) 482, which is to the effect that, although a statute providing a penalty for interference with the transmission of mails did not contain an exception, yet an officer might lawfully arrest a mail carrier upon a warrant charging him with the crime of murder, even though it operated to cause delay. Other cases are cited in this contention which are mentioned in the opinion in *Cram v. Chicago, B. & Q. R. Co.,* 84 Neb. 607, a case involving the validity of the same statute. The trouble is that to write so many exceptions into the statute would be judicial legislation. We held in the *Cram* case that the common-law exemption of common carriers from liability for loss occasioned by the act of God or the public enemy may be presumed to have been in the legislative mind, and therefore the court may properly allow them to be made, though not expressed in the text; but this is as far as we find warrant to go.

Plaintiff insists that the constitutionality of the law was fully considered and definitely upheld in the *Cram* case, and that the question cannot be relitigated. But the main question in this case was not then presented or in issue. But little testimony was offered, and no concrete facts were presented to demonstrate that a speed of 14 or 18 miles an hour was unreasonable or impracticable. That

case was determined, as to the practicability of operation of trains within the prescribed limit, on an *a priori* basis. In the opinion it is said: "The statute does not deny the carrier the right to defend an action brought thereon, nor state what, if any, defenses may or may not be available in such a case. Defendant will not be in position to complain in this particular until, in a concrete case, wherein it has presented and maintained or offered to maintain a legitimate defense, the courts have determined that the statute denies the carrier that right."

We are now presented with concrete cases in which defense was attempted by showing that a large portion of the time occupied by delay in transit was absolutely necessary in the proper and lawful operation of the railroad. The district court, however, determined that the statute denied the carrier the right to make such defense, or rather refused to hold that the statute permitted such a defense to be made, and, hence, a new question is presented here not determined in the former case. A statute may be upheld as against an attack made by one party claiming it to be invalid upon one ground, and still it may be declared unconstitutional in a later attack by another litigant for reasons not called to the attention of the court, or not shown to exist, on the first attack. The facts here in evidence were not adduced in the *Cram* case. It may be that on account of the difference in the character and equipment of the two railroads, the weight of metal in the rails, or amount of ballast on the track, the nature of the localities through which their lines run, the different facilities for operation, etc., such a defense could not have been made by the defendant in that case. At all events no such showing was made. There was evidence in the *Cram* case showing, as a general proposition, that in the management of traffic the defendant was compelled to side track trains containing live stock and wait for passing trains; but there was no specific evidence applying to the particular shipments in controversy, nor as to other matters for which it is now asserted deductions of time should be allowed, nor as to the

need of special trains if the statute was to be complied with. The questions at issue here were not presented, and it was held that it was unnecessary to consider whether facts not in evidence might constitute a defense.

A difficult question in the case is whether, if the defendant complies with the statute strictly, incurring very large expense for special trains, and making the cost of intrastate transportation of live stock westward, if carried on at the present rates, unremunerative, a sufficient remedy is furnished by the fact that it may apply to the state railway commission for an increase of rates, or whether it is the duty of the court, considering the impracticability of operation of such trains in many cases, the lack of qualification or excuses in the statute for unavoidable delays, and the additional expense which the operation of such trains at the statutory rate of speed must entail, to declare that such a statute is an unreasonable exercise of the police power, and therefore void. The extra expense of carrying on the west-bound traffic within the time limit is not necessarily the determining factor.

The case does not involve a consideration of the whole scheme of rates for the carrying of freight, but merely whether an order by the legislature to perform certain acts within a limited time is valid, and the question whether the operations of the railroad as a whole may be carried on profitably is not an issue in the case.

"The distinction between an order relating to such a subject and an order fixing rates coming within either of the hypotheses which we have stated is apparent. This is so because as the primal duty of a carrier is to furnish adequate facilities to the public, that duty may well be compelled, although by doing so as an incident some pecuniary loss from rendering such service may result. It follows, therefore, that the mere incurring of a loss from the performance of such a duty does not in and of itself necessarily give rise to the conclusion of unreasonableness, under the doctrine of *Smyth v. Ames,* 169 U. S. 526." *Atlantic C. L. R. Co. v. North Carolina C. C.,* 206 U. S. 1, 26. But the

fact that the performance of such duty is unremunerative is a weighty and important factor for consideration in passing upon the reasonableness of the provision. *Missouri P. R. Co. v. Kansas*, 216 U. S. 262. The real question is whether, considering all the facts in evidence as to the impracticability of complying with the statute in many instances in east-bound shipments, and for the greater portion of the year in west-bound shipments, the necessity of preventing discrimination against interstate traffic by reason of giving precedence to trains carrying live stock for intrastate delivery, and of compliance with the federal safety appliance act, the requirements of the law are reasonable, or whether they constitute an unreasonable exercise of the police power and interfere with the constitutional rights of the defendant. If the legislators could have known or foreseen the necessary delays and the innumerable contingencies that may occur in the operation of trains as shown by evidence in these cases, they, we feel certain, would have allowed further latitude to the carriers. The legislature knew of the existence of the evil, and that stock shippers were often vexed by delays whereby they suffered damage, and properly sought to provide a remedy. There is no doubt that a statute or order regulating the rate of speed of the carriage of live stock is a proper exercise of the police power of the state, whether provided for by the legislature or by an order or regulation of the state railway commission, but such a statute or order must be reasonable and practical in its operation, and it must not impose an undue burden upon the carrier, nor take away any of its constitutional rights. In North Dakota a statute similar to this was declared unconstitutional before experience as to its operation had been had. *Downey v. Northern P. R. Co.*, 19 N. Dak. 621, 26 L. R. A. n. s. 1017.

The state of Kansas has a speed statute (Laws 1907, ch. 276) which fixes 15 miles an hour as the rate of speed, "unless prevented by unavoidable cause," and it allows the recovery of all damages to the shipper, with a reasonable

attorney's fee. This law seems to be reasonable in its terms, and apparently has been complied with, since no opinions have been reported touching its validity.

The question whether statutes which attempt an unreasonable exercise of the police power may be valid has been directly passed upon by the United States supreme court. Though that court concedes the validity of laws designed to secure the safety and comfort of passengers, or employees, or persons crossing the railroad tracks, it has been repeatedly held that a statute making an unreasonable exercise of the police power of the state, which interferes with interstate commerce, or which has the effect to deprive the carrier of its property without due compensation, or to deny it the equal protection of the laws, is invalid. A discussion of how far the right of regulation may go, with a consideration and citation of prior cases on the subject, may be found in the opinion of Mr. Justice Brown in *Cleveland, C., C. & St. L. R. Co. v. Illinois,* 177 U. S. 514, wherein a requirement that express trains intended only for through passengers should stop at every county seat, when accommodations were provided by local trains, was held to be unreasonable and invalid. *Chicago, B. & Q. R. Co. v. Railroad Commission of Wisconsin,* 237 U. S. 220.

A Texas statute (2 Sayles Tex. Civ. St., art. 4502) provided that, when the shipper made application in writing to a railroad company to supply a number of cars for the shipment of freight, on the failure of the company to supply such cars within six days from the receipt of the application, it should forfeit to the party applying $25 a car for each car they failed to furnish, and be liable for all damages the applicant might sustain, with a countervailing penalty for failure on the part of the shipper to take the cars when furnished. The only exemption provided was that the act "shall not apply in case of strikes or other public calamity." In the opinion in *Houston & T. C. R. Co. v. Mayes,* 201 U. S. 321, the court said, by Mr. Justice Brown: "While there is much to be said in favor of laws compelling railroads to furnish adequate facilities for the transportation of

both freight and passengers, and to regulate the general subject of speed, length and frequency of stops, for the heating, lighting and ventilation of passenger cars, the furnishing of food and water to cattle and other live stock, we think an absolute requirement that a railroad shall furnish a certain number of cars at a specified day, regardless of every other consideration except strikes and other public calamities, transcends the police power of the state and amounts to a burden upon interstate commerce. It makes no exception in cases of sudden congestion of traffic, an actual inability to furnish cars by reason of their temporary and unavoidable detention in other states, or in other places within the same state. It makes no allowance for interference of traffic occasioned by wrecks or other accidents upon the same or other roads, involving a detention of traffic, the breaking of bridges, accidental fires, washouts or other unavoidable consequences of heavy weather."

"Although the statute in question may have been dictated by a due regard for the public interest of the cattle raisers of the state and may have been intended merely to secure promptness on the part of the railroad companies, in providing facilities for speedy transportation, we think that in its practical operation it is likely to work a great injustice to the roads, and to impose heavy penalties for trivial, unintentional and accidental violations of its provisions, when no damage could actually have resulted to the shippers."

"While railroad companies may be bound to furnish sufficient cars for their usual and ordinary traffic, cases will inevitably arise where, by reason of an unexpected turn in the market, a great public gathering, or an unforeseen rush of travel, a pressure upon the road for transportation facilities may arise, which good management and a desire to fulfil all its legal requirements cannot provide for, and against which the statute in question makes no allowance.

"Although it may be admitted that the statute is not far from the line of proper police regulation, we think that suf-

ficient allowance is not made for the practical difficulties in the administration of the law, and that, as applied to interstate commerce, it transcends the legitimate powers of the legislature."

It is clearly shown that, unless further exceptions and exemptions are interpolated in the law, the operation of trains at the speed required by the statute would in many cases be impracticable, would operate to interfere with the operation of trains carrying mail, interstate commerce, and with the transportation of other freight. It is also in evidence that an enormous increase in the rates charged by defendant would be necessary in order to so adjust the whole transportation facilities of the railroad as to provide for accelerated service, in many instances requiring special trains consisting often of from one to a few cars of live stock. These are burdens which interfere with the business of tranportation and violate defendant's constitutional rights.

It is argued that, since this court has held that a statute is valid making a railroad company insurer of the safety of passengers, regardless of whether it was at fault for an accident which caused an injury, it must hold that this statute is also proper legislation. The law as a matter of public policy exerts exceeding care to conserve human life and personal safety. Such an object is not to be compared to the mere monetary loss which may occur by reason of delay in the carriage of live stock. Public safety is of supreme importance, and stringent measures, used to exert pressure upon carriers of passengers so that nothing less than the greatest care and diligence will be used by them in such carriage, are entirely justifiable. The statute under consideration is an exercise of police power, and it must be reasonable in order to be valid. The legislature has not the power to interfere in an arbitrary manner with the conduct of a business or occupation by a police regulation, unless the regulation bears some definite and reasonable relation to the public welfare, and to enforce it does not infringe upon constitutional rights. Each person is guar-

anteed the liberty to carry on his lawful business or occupation unhampered, except by regulations necessary for the public welfare, having just relation to the object sought, and not unreasonably oppressive.

Plaintiffs argue that the best answer to the contention that the railroad companies cannot comply with the law is the fact that the evidence shows that they are complying with it. Where this evidence is to be found in the record has not been pointed out, and we have not found it. Plaintiffs say that the court can take notice of the fact that few cases have been brought here on appeal. On the other hand, defendant says that a large number of claims are outstanding awaiting a decision upon these appeals. These statements are alike based on facts not in the record. The contention of plaintiffs is that, "so long as the aggregate business of transporting this class of property is adequate and profitable, the company cannot complain, and no claim or color of claim can be made, upon the evidence, that the Northwestern railroad company is not making money in the transportation of live stock in Nebraska," and much is said in the briefs with regard to the profits that defendant is making, the dividends it is paying, and the amount of money it is investing. There is no evidence of this kind in the record, and, if the facts are as stated, they are not so public and notorious that the court can take judicial notice of them. Under the undisputed evidence, we conclude that the statute cannot be enforced without unduly interfering with the constitutional rights of this defendant. It is possible that with other railroads, better built and equipped, whose lines run through a richer territory, with fewer converging branch lines, or with heavier rails or double tracks, the difficulties shown here do not exist, and the act might be enforceable, but we cannot draw a line and say the act is enforceable as applied to one railroad and invalid as to another, or as to shipments in one direction and not to shipments in the other direction. The object and purpose of the law is within the proper police powers of the state. The legislature is about to meet, and it is to be presumed

that, with the knowledge gained by experience of the practical operation of the statute, that body may amend it by allowing further and proper exemptions, permit other defenses to be made, or in such other manner that it may not be vulnerable to attack. The several judgments of the district court are reversed, and the causes are remanded.

REVERSED.