## No. 11,764.

### FREEMAN, ET AL. v. BOYER BROTHERS.

Decided November 21, 1927.  Rehearing denied December 12, 1927.

Action for damages.  Judgment for plaintiff.

## *Reversed.*

1.  CARRIERS—*Live Stock—Damages—Burden.*  In an action against a carrier by a shipper of live stock, for damages alleged to have been occasioned by failure to transport the stock within the time limit prescribed by C. L. § 2997, it is held that the plaintiff was required only to make out a prima facie case of damages, after which defendants had the burden of establishing the only defense interposed, viz., unconstitutionality of the statute.

2.  TRIAL—*Directed Verdict.*  If there is a substantial conflict of the evidence on an issue of fact, there is no error in the refusal of the court to direct a verdict.

3.  APPEAL AND ERROR—*Presumption—Burden.*  On review, the Supreme Court must view the evidence in the light most favorable to the successful party, and the burden is upon plaintiff in error to show prejudicial error.

4.  *Conflicting Evidence.*  In an action by a shipper of live stock against a carrier for damages because the live stock was not transported within the time limit prescribed by C. L. § 2997, evidence reviewed and held to contain no conflict which would justify the submission of the case to the jury.

5.  CARRIERS—*Regulatory Statutes—Speed Limit—Constitutional Law.*  C. L. § 2997, providing that live stock must be transported by carriers in Colorado at an average rate of speed of not less than 10 miles per hour, held to be an unreasonable exercise of the police power of the state, and unenforceable as to the particular railroad involved in the instant case, owing to its location and difficulties of operation.

6.  STATES—*Police Power—Carriers—Transportation of Live Stock.*  While the imposition of a time limit for the transportation of live stock by carriers is well within the police power of the state, an unreasonable exercise of that power, culminating in a statute, may not be enforced, although the general subject matter of the legislation comes within the scope of the power.

7. JUDGES—*Personal Knowledge.* While judges may not base their decisions upon personal knowledge of cases, such knowledge may be utilized as an aid to the appreciation of conditions bearing upon questions to be determined.

8. CONSTITUTIONAL LAW—*Jurisdiction.* District courts are invested with the same authority as that possessed by the Supreme Court to pass upon constitutional questions.

9. CARRIERS—*Statutes—Constitutional Law.* A statute imposing limits on carriers as to the rate of speed with which live stock must be transported within the state, while it may be applicable to one or more railroads, may be inapplicable and unconstitutional as to another, which because of the location of its road and difficulties attending its operation, cannot with due regard to the safety of its employees and duty to the public, comply with its provisions.

*Error to the District Court of the City and County of Denver, Hon. Charles C. Butler, Judge.*

Messrs. SMITH & BROCK, Mr. ELMER L. BROCK, for plaintiffs in error.

Mr. LESLIE E. GREEN, for defendant in error.

Mr. HAROLD W. PERRY, amicus curiae.

*En Banc.*

MR. JUSTICE CAMPBELL delivered the opinion of the court.

THE plaintiff corporation brought this action to recover, and it recovered, actual and exemplary damages of the receivers of The Denver & Salt Lake Railroad Company, for their failure to transport the plaintiff's live stock from Steamboat Springs to the city of Denver within the time required by section 2997, C. L. 1921. There was no claim of negligent delay. The action is based entirely upon the statute, which reads: "2997. Transportation of live stock. Ten miles per hour.—

Sec. 20. .Every common carrier in this state must transport live stock from initial point of shipment in this state to point of destination in this state at an average rate of speed of not less than ten miles an hour; and within such time, from the hour of loading at the initial point to the hour of arrival at destination, that the point of destination shall be reached in not.more than one-tenth as many hours as there were miles required to be traveled in the transportation of such shipment; except only that necessary stops of reasonable duration for feeding purposes, when required by the length of the journey, or necessary and imperative delays caused only by the act of God or inevitable accident shall not be computed in determining such minimum requirements as to speed.''

The following section 2998, which is section 21 of the act, provides that for a breach of the statute the carrier shall pay to the parties injured such actual damages as may be sustained, together with exemplary damages, the amount of which, within the statutory limit, is to be ascertained by the court or the jury trying the action.

Our first statute upon the subject of time limit for transporting live stock is the Act of 1910, S. L. 1910, p. 45. In view of the contention of the plaintiff that that statute being held valid in *Colorado & Southern Ry. Co. v. Railroad Commissioner*, 54 Colo. 64, 129 Pac. 506, as it was, and that such decision governs here—the applicability of which we deny—we here point out some of the differences between the two acts that make the decision in that case not suitable to the facts here. The 1910 Act provides for a minimum, the 1921 Act for an average, speed of ten miles per hour. The Act of 1910 allows only actual, while the Act of 1921 allows both actual and exemplary, damages. The Act of 1910 excuses the carrier for excessive storms, unavoidable accident to roadbeds which delays shipments beyond the power of the carrier immediately to overcome, and requires the minimum speed to be maintained continuously

without unnecessary delays or longer stops than or regular stops at stations, and stops for feeding, icing and watering. The 1921 Act excuses delays in shipment, and failure to maintain the average rate of speed, plaintiff itself says, only where the same have been caused by the act of God or are the result of inevitable accident.

This decision as to the South Park Railroad is not controlling here. We said in the course of our opinion there, in stating the different regulations prescribed by the statute, that the railroad commissioners were authorized to regulate the speed of trains. In that case, however, there was no controversy over any regulation or rule of the commissioners which purported to prescribe such time limit, and no expression of opinion concerning the same is found in the opinion. As we shall see later in the course of this opinion in the present case, we are in accord with the opinion in the South Park Company case that the general subject matter of such regulation is within the police power of the state. The question there determined was that the railroad commission had the power to require a railroad company to resume the operation of a branch of its railroad which it had abandoned, even though in such resumption a part of its system will not yield net returns. There was no occasion for the court in that case to determine whether or not any particular regulation of the commission affecting the time of operating trains was valid.

In this case the plaintiff's cattle were not transported from Steamboat Springs, where they were loaded, to the stockyards in Denver, their destination, a distance of 214 miles, within the time required by the statute, which is 21 hours and 24 minutes. Considerably longer time was consumed. Trial was to a jury which found for the plaintiff and awarded it $300 actual damages and $200 exemplary damages, upon which the court entered judgment of $500 against the defendants, and the latter are here with their writ to review the same.

In their answer defendants admit the failure to comply with this statute and seek to justify such failure upon the ground that, though it may be physically possible to operate a freight train carrying live stock from Steamboat Springs to Denver, a distance of 214 miles, in the statutory required time of 21 hours and 24 minutes, it is, under the evidence in this record, practically impossible to do so in view of the peculiar nature of the railroad, its location, and the operating conditions incident thereto, to move such a train within the statutory time with safety to its trainmen and the general public, or consistently with safe and good railroading, and without subjecting themselves to damages for injury to trainmen and to the property shipped. Under the issues as framed plaintiff was required only to make out a prima facie case of damage, which it did, and thereupon the defendants had the burden to establish the only defense interposed, the unconstitutionality of the statute, which they attempted to do. Plaintiff in turn introduced evidence whose object was to overcome, or so weaken the case as made by the defendants as to give rise to a substantial conflict in the evidence upon such questions of fact which justified the trial court in submitting to the jury for its determination, whether or not, consistent with good and safe railroading, it was practicable for defendants to comply with the statute. If the plaintiff's rebuttal evidence is of such probative effect as to give rise to a substantial conflict, or if it tends to show that defendants could, in accordance with the applicable rule, comply with the statute, the trial court did not err in refusing, at the defendants' request, to instruct the jury to return a finding for them.

Admonished by plaintiff's counsel that, in reviews by this court of judgments of inferior courts, we must view the evidence in the light most favorable to the successful party at the trial below and therefrom draw all inferences fairly deducible, we shall endeavor to conform to the suggestion and assume, as we do, that the burden is on the

defendants affirmatively to show prejudicial error. At the outset of the discussion of the important question before us, we observe that no errors are assigned to rulings of the trial court on questions of evidence, or as to its clear and lucid instructions to the jury, if the case as made upon the evidence, considered as a whole, justified its submission to that body. The only error assigned and argued, which goes to the very root of the controversy, is the invalidity of the statute as applied to the defendants' railroad. In view of the conclusion which we have reached that the speed limiting statute, according to the overwhelming weight of the evidence, is, as applied to this particular railroad, an unreasonable exercise of the police power of the state, we shall not consider the objections that the statute imposed a burden on interstate commerce, or that the provision as to exemplary damages is arbitrary and, if enforced, would deprive the defendants of their property without due process of law. Our sole inquiry, therefore, is whether or not, upon this record, we can say that the statute is unconstitutional upon the ground that compliance therewith is practically impossible, consistent with good and safe railroading. This necessarily leads to a consideration of the entire evidence, both for the plaintiff and the defendants, that was produced at the trial.

The defendants called as their principal witness Mr. Phelps, who has been general superintendent of the railroad company for many years. The Denver & Salt Lake Railroad, a single line road, which has been operated for about fourteen years, starts at Denver, Colorado, the eastern terminus, and crosses the continental divide at an elevation of about 11660 feet. Practically the entire line of the road is in a mountainous territory. It has 54 tunnels, 271 bridges, 4 miles of snowsheds, 28 miles of 4 per cent grade and 88 miles of 2 per cent grade. About one-half of the mileage is in curvature of high degree, that it is practically impossible, owing to the topography of the country in which the road runs, to

locate, at convenient points, sidings for the meeting of passing trains. The use of different types of locomotives is necessary on different portions of the road which requires the changing of locomotives at various points. It is also necessary to use helper engines on different sections, which involves necessary delay in putting on and cutting out these helper engines. Frequent stops must be made for the inspection of the brakes and the apparatus in connection therewith and to permit car wheels to cool on descending grades. The railroad company from time to time has made and promulgated rules for the running of its trains and for the safety of its employees and the general public, which limit the speed of trains at various places to 15, 12, 10 and 6 miles per hour. Experience in the operation has shown that slides of snow, rock and dirt often occur on various sections of the road and that because of such slides it becomes necessary in the operation of trains so to regulate the speed that these slides can be avoided by the engineer when encountered. These and similar facts the evidence tends to show, affect the speed of trains and, as the witness testified, make it impossible, consistent with good and safe railroading to comply with the speed limit of this statute, considering that it is the duty of all common carriers to carry passengers and freight with safety, and to safeguard their own employees and the public. The witness Phelps proceeds at great length with a description of the geographical and physical conditions from one end of the road to the other and points out the adverse conditions that are incident to the location and operation of a railroad in such territory. There are many 16-degree curves, which the witness says is about the maximum curvature for practical railroading, and this very seriously affects the matter of speed. On the grade from Tolland over the continental divide to Irvings the curvature on the 4 per cent grade makes one complete circle per mile. Most of the tunnels along the road are on curves and some of them are reverse curves in the

tunnels themselves. Snow troubles start on this road about the middle of September. From that time on throughout the winter it is necessary ordinarily to use snow-fighting apparatus like rotary plows. The temperature drops as low as 40 or 50 degrees below zero and the snow plows are in constant use from September until about the first of June. The superintendent traced for the jury a train of live stock from Steamboat Springs to the union stockyards at Denver and showed the stops required by the prescribed rules and therefrom he testifies that the total time consumed in the various operations, such as picking up helper engines, taking water, changing locomotives, crews and cabooses, inspecting trains, putting trains in shape to descend the steep grades, inspection and adjustment of trains in the snow-sheds, cooling of wheels, stopping at terminal points, amounts to 9 hours and 45 minutes. The witness testified that the rules prescribed by the company were reasonably necessary and were required in the interests of safety, and that the time consumed in the necessary stops in the passage of a train between Steamboat Springs and Denver was reasonably necessary. The witness admitted that it might be, in some instances, that not so much time was consumed in the actual operation of a train, and he also said that the rules might be disregarded by the train crews without incurring danger. Sometimes the trainmen, contrary to instructions, take chances and "get by with it," as the witness says, which would be unknown to the company, but whenever such violations of the rules occur and notice thereof is received by the officials the trainmen guilty would be disciplined. The superintendent also said that it is physically possible to increase the speed, if everything goes well, but that it is not safe or good railroading to violate the rules, and it is practically impossible, in accordance with good railroading to operate freight trains between Steamboat Springs and Denver, though it might be physically possible to do so, within the time limit, and that

according to the rules and regulations the superintendent said that in his opinion 28 or 29 hours were necessary therefor.

Mr. Culbertson, who had been chief dispatcher of the railroad for many years, substantially corroborated Mr. Phelps as to the physical conditions, and as to the inability of the company to comply with this statute limiting the average speed of trains to not less than 10 miles an hour. The chief clerk to the superintendent of car service testified that during the month of October, 1922, which was the month that the shipment in question was made, there were 90 cars of live stock shipped from Steamboat Springs to the Stockyards in Denver, which were moved in 8 different trains. The first shipment required 33 hours and 5 minutes; the second, 32 hours and 25 minutes; the third, 26 hours and 40 minutes; the fourth, 28 hours and 20 minutes; the fifth, 27 hours and 25 minutes; the sixth, 26 hours and 10 minutes; the seventh, 26 hours and 10 minutes; the eighth, 32 hours and 30 minutes, or an average on all trains of 30 hours and 39 minutes. In the month of November, 1922, 51 cars of live stock were transported between the same two points. There were 6 trains. The first consumed 30 hours and 10 minutes; the second, 29 hours and 45 minutes; the third, 26 hours and 55 minutes; the fourth, 36 hours and 5 minutes; the fifth, 31 hours and 15 minutes, and the sixth, 32 hours, being an average on all shipments of 31 hours and 1 minute. For the month of September, 1922, there were 106 cars in 7 trains. The average running time of these shipments was 33 hours and 29 minutes. Similar testimony as to other months and years was substantially to the same effect. The testimony is that employees are paid by the hour and from this it is asserted by counsel for the defendants that economical reasons would impel the railroad company to move these shipments over the road as fast as is reasonably practical so as to cut down transportation expenses and also in order speedily to release the equipment.

The assistant auditor of the road, Mr. Moore, testifies that approximately 60 per cent of the total tonnage on this railroad moves in interstate commerce, and he also testifies as to the average speed per hour on freight trains, which harmonizes with that of the other witnesses.

A careful reading of this testimony convinces us, and it is from expert witnesses who are familiar with the history of, and the operation of trains on, this road for many years, that, as applicable to this particular railroad during the live stock shipping months of September, October and November of each year, even though it is physically possible to do so, yet it is not practically possible, consistent with safe railroading, to operate freight trains carrying live stock at this season of the year at an average rate of speed of not less than 10 miles an hour which is the statutory requirement. Unless, therefore, the rebuttal evidence of the plaintiff shows that there is a substantial conflict in the evidence upon this point, we must hold the statute unconstitutional.

The plaintiff's counsel, while admitting that the above summary of the evidence is substantially correct, maintains that, in his cross-examination of the witness Phelps, his testimony was materially weakened in that it showed the possibility of shortening the time for various stops at different portions of the line to which he testified, and that it was physically possible to operate a train between Steamboat Springs and Denver within the statutory speed limit. We have examined this record carefully as to this cross-examination and the most that can be said of it in favor of the plaintiff is that the witness testified that it was physically possible to comply with this statute, but it was impossible to do so as a practical proposition consistently with good and safe railroading, or with due regard to the safety of the trainmen and the public, and to the safety of the property shipped. Without going into detail as to this point we are satisfied that the cross-examination of the defendants' witnesses did not produce any substantial conflict in the evidence, or in any

material sense weaken the same, or bring about any such condition as to justify the trial court in submitting the issue to the jury.

The plaintiff called also as a witness Mr. Rose, who during the live stock shipping period of 1917 was employed as a brakeman by the railroad company. We find nothing in the record that shows Rose to be qualified as an expert to give testimony upon the question as to the ability of the railroad company to comply with this speed statute. Rose, however, in answer to a question if he had occasion to observe the rate of speed at which live stock could be moved over the road, said: "Why, yes to a certain extent." Pressing the matter further, counsel elicited from the witness the further answer: "Well, I do not know the exact time required to move it; some trips are made faster than others." To further inquiry by plaintiff's counsel, the witness answered that trains should be moved at the rate of 10 miles. To an objection by defendants' counsel as to what should be done, the witness was asked whether he knew how long it took to move freight trains between these two points, and he replied: "Well, I do not know the exact time it takes to move anything." He was then asked as to whether live stock could be moved at an average rate of 10 miles per hour in 1917 and 1918, to which he answered: "Yes." Plaintiff's counsel then said to the witness: "You said yes?" and the answer of the witness was: "Yes, they could have been at that time as far as being familiar with the road, the condition as related to the present date, I do not know." The witness was then asked to express an opinion on the matter with reference to the years 1917 and 1918, that is, whether the average speed of 10 miles could be made, to which he answered: "1917, they could not be." The trial court then inquired about the year 1918, to which the witness replied that he was not with the road in the fall of 1918. Plaintiff's counsel pursued the matter further and asked the witness if he recalled shipments having been made

at the average rate of 10 miles per hour, to which he answered: "Well, I could not now over the entire three divisions; we were assigned to different divisions and we only handled a train on one division, but we made better time on the respective divisions than——." The evidence discloses that the witness had not been in the employ of the railroad for several years before the time of the trial. He worked in the capacity of a brakeman. He never rode a train through from one end of the road to the other. He never had occasion to know particularly the speed of the train or the records of train movements and was not requested to keep, and did not keep, any records. We do not consider the testimony of Rose of any material bearing. It is so uncertain and indefinite and unreliable that it does not tend in any degree to weaken the testimony of the witnesses for defendants; neither is it of such probative force as to require a submission to the jury for its finding.

The foregoing summary of the testimony, which we reproduce largely from defendants' briefs, given by witnesses qualified to speak, in legal effect, we think amounts to a demonstration that though physically possible, it is not consistent with good and safe railroading, for freight trains on this railroad to maintain the statutory average speed of 10 miles per hour; that this showing in defendants' behalf is not in the eye of the law weakened or impaired by the statements and admissions of the plaintiff's witnesses brought out on their cross-examination by the able counsel for defendants; and that the testimony of the plaintiff's so-called expert witness Rose does not even tend to impair its force. But counsel for the plaintiff says, and upon this he lays much stress, that one shipment of live stock in October, 1925, was made by the defendants over this railroad from Steamboat Springs to the stockyards in Denver within the time limit of this statute, and because he says, if, as is true, one trainload of live stock was so moved between these two points, it is practicable and good and safe railroading

for the defendants to make other similar shipments within the same time. Before the trial, plaintiff's counsel had obtained from the trial judge an order for an inspection of the defendants' records of train movements. He was given free access to them and in his search discovered that one car of live stock had been transported from Steamboat Springs to Denver in 24 minutes less than the statutory time. From this one instance he reaches the conclusion above stated that other movements as a regular thing can safely be made. This may be specious, but it is not sound, reasoning. It is akin to postulating a certain thing as if it had been demonstrated; a species of laying down an assumption without proof. True, the fact thus established proves that it is physically possible to run a freight train over the road at an average speed of 10 miles per hour, and it may be, though the record is silent, that no injury occurred and no damage was suffered by the carrier. Indeed, Superintendent Phelps admitted that it is physically possible to maintain the statutory speed. That, however, is not the controlling thing. The question for decision is not whether it is physically possible in one or more instances to do so but, consistently with good and safe railroading and with due respect to the safety of trainmen and the public, and in view of the defendants' duty as a common carrier safely to transport and deliver its freight at the peril of being mulcted in damages if it does not, is it practically possible to comply with the prescribed speed limit in the general operation of its trains in transporting live stock? This one instance of the accomplishment is not of itself sufficient to require submission to a jury for its decision whether safe railroading, etc., as above outlined, may be carried on if the speed limit is observed. The overwhelming weight of the evidence is that it is practically impossible as a legal conclusion from the evidence submitted by the defendants whose force is not weakened. Defendants' railroad has been operated for about fourteen years. Plaintiff's astute

counsel, with free access to the file record of defendants' train movements, has discovered only one instance where transportation of live stock has been made within the statutory speed limit. It is not a sufficient answer for the plaintiff to say that this movement of a car was in the same calendar month of October in a different year over the same route. Counsel needs no reminder that his case would be much strengthened by other like movements, if any, and if the records showed any he would likely have discovered them.

The respective counsel concur in the statement that there have not been many decisions upon the precise question involved here. The cases cited and discussed by them are: *Leibengood v. M., K. & T. Ry Co.,* 83 Kan. 25, 109 Pac. 988, reported also in 28 L. R. A. (N. S.) 985; *Downey v. Northern Pac. Ry. Co.,* 19 N. D. 621, 125 N. W. 475, 26 L. R. A (N. S.) 1017; *Cram v. Chicago, B. & Q. R. R. Co.,* 84 Neb. 607, 122 N. W. 31, 26 L. R. A. (N. S.) 1022; the same case was affirmed in 228 U. S. 70, 33 Sup. Ct. 437, 57 L. Ed. 734; *Chicago, B. & Q. R. R. Co. v. Kyle,* 228 U. S. 85, 33 Sup. Ct. 440, 57 L. Ed. 741; *Davison v. Chicago & N. W. Ry. Co.,* 100 Neb. 462, 160 N. W. 877, L. R. A. 1917C, 135.

Each of the parties claims some recognition in these opinions of its or their contention. In the Leibengood case the holding was that the Kansas speed limit statute is not applicable to a shipment of live stock from a given point in one state to another point in the same state, which passed through another state for a part of the distance. There was no discussion and no expression in the opinion as to the effect of the statute as to intrastate traffic, though the court said if it was intended to apply to interstate commerce it would necessarily be invalid. In the Downey case, similar in its facts to ours, and under a similar statute, the legislation was held unconstitutional as an unreasonable exercise of the police power of the state. We think that opinion is not only a well-reasoned one, but authority for our conclusion.

The writer of the opinion says that *Houston & T. C. R. Co. v. Mayes,* 201 U. S. 321, 26 Sup. Ct. 491, 50 L. Ed. 772 is nearer in point to the case there at bar than any cited in the briefs, and quotes with approval from the opinion in the Mayes case the following: "While there is much to be said in favor of laws compelling railroads to furnish adequate facilities for the transportation of both freight and passengers, and to regulate the general subject of speed,  *  *  *  we think an absolute requirement that a railroad shall furnish a certain number of cars at a specified day, regardless of every other consideration except strikes and other public calamities, transcends the police power of the state and amounts to a burden upon interstate commerce."

The learned judge further points out that there are no exceptions in the statute, as there should be, in cases of sudden congestion of traffic, actual inability to furnish cars by reason of their temporary or unavoidable detention in other states. Neither was any allowance made for interference of traffic occasioned by wrecks or other accidents on the same or other roads and similar unavoidable consequences.

The special pertinency of the Downey case here is the approving reference in the opinion therein of the decision of the Supreme Court of the United States in the Mayes case holding void an absolute requirement of a statute that carriers must furnish cars to shippers within a certain time. The principle is the same in an absolute requirement that carriers must maintain an average rate of speed. In both cases the requirement is absolute. In our statute the only excuses for delay in shipping live stock are acts of God and inevitable accident. In the Texas statute the only excuses for failure to furnish cars within a certain time are strikes and public calamities. The Supreme Court of the United States, in the Texas case, said that such a statute transcends the police power of the state, and amounts to a burden on interstate commerce. We say, upon the same principle and reason-

ing, as did the North Dakota court in the Downey case, that such a statute is an unreasonable exercise of the police power. None of the various other exceptions pointed out in the Mayes and Downey cases are by our statute considered excuses for failure to comply. Therefore, the statute is not enforceable. Indeed, counsel for the plaintiff virtually admits that the Downey opinion is against his contention, but he dismisses it with the observation that it is dictum and not well-reasoned. We disagree in both characterizations.

In the Cram case the Supreme Court of Nebraska held that the Nebraska statute, which required an average speed of 12 miles an hour, was constitutional under the facts then before it. The court in its opinion, however, took occasion specifically to say that a certain suggested defense that was supposed to have evidence in its support, viz.: that the delay complained of there was occasioned by the natural results of a careful operation of its trains, was not sufficiently explicit to enable the court to find as matter of fact whether or not such operations excused the delay. The Nebraska court, therefore, properly said it was not there necessary to consider whether the facts relied upon, if properly presented, would have constituted a defense to the action. This particular point is more clearly brought out in a later case by the same court, the Davison case, supra, to which we shall presently refer at greater length. The Nebraska court in this Davison case held that as to the particular railroad, Chicago & N. W. Railroad, defendant in that case, the Nebraska statute under the facts there produced in evidence, was unconstitutional as an unreasonable exercise of the police power. The Cram case was affirmed by the Supreme Court of the United States in 228 U. S. 70, 33 Sup. Ct. 437, 57 L. Ed. 734. The language of the opinion by Mr. Justice McKenna bears evidence that it was carefully selected and guarded so as not to include a state of facts not present in that case, which, like the facts in this case now before us, would

call for a different judgment. In the first sentence of the opinion the learned judge said: "The case is here in a simple aspect. There was no attempt made to explain or justify the delays in the shipments, and any attack on the statute on the ground that it includes delays resulting from the act of God or cause over which the carriers have no control is precluded by the construction put upon the act by the Supreme Court of the State.

"The only proposition, then, which is presented is whether the statute is beyond the power of government and, therefore, offends the Fourteenth Amendment of the Constitution of the United States by depriving plaintiff in error of its property without due process of law."

To place the matter beyond dispute that the Supreme Court of the United States was not laying down a rule which is applicable in a case where a successful attempt is made to explain or justify delays in its shipments, the court, in concluding its opinion said: "We repeat, the case is here in a simple aspect. Two propositions only are involved: (1) the power of the legislature to impose a limitation of the time for the transportation of livestock; (2) to provide a definite measure of damages which may be difficult to estimate or prove."

The court held that both propositions were well established in law. So here, we say that while the imposition of a limitation of time for the transportation of live stock is well within the police power of the state, nevertheless an unreasonable exercise of that power culminating in a statute, may not be enforced, although the general subject matter of the legislation upon it comes within the scope of the power. Neither the Nebraska Supreme Court nor the Supreme Court of the United States held, or intended to hold, that such a speed-limiting statute would be constitutional if it was intended to, and did in terms, apply to the operation of a railroad in transporting live stock under such a state of facts as is presented in this record. Both courts—the Nebraska Court expressly, and the Supreme Court of the United States by

necessary implication—in their opinions say that failure to comply with a speed-limiting statute by any particular railroad, is excused, if the same results from its inability to comply by reason of its peculiar location, the difficulties of operation, the character of its line, and because of all the other things established by the evidence in this case. A statute not giving effect to such excuses would not be a reasonable exercise of the police power of the state.

The Davison case from Nebraska is clearly in point. The same statute that was held valid in the Cram case as affecting the Chicago, B. & Q. Railroad, from the facts then before the court, was in the Davison case held unconstitutional as to the Northwestern Railroad under essentially different facts which are similar to the facts in the case at bar. In the Davison case the gist of the decision is found in the headnotes prepared by the writer of the opinion. It was there said: "1. A statute may be upheld as against an attack made by one party claiming it to be invalid upon one ground, and still it may be declared unconstitutional in a later attack by another litigant for reasons not called to the attention of the court, or not shown to exist, in the first case. 2. A statute or order regulating the rate of speed of the carriage of live stock is a proper exercise of the police power of the state, but such a statute or order must be reasonable, and practical in its operation, and it must not impose an undue burden upon the carrier, nor take away any of its constitutional rights."

The entire opinion contains a valuable discussion of this question and it is in accordance with the conclusion which we have reached. It is unnecessary further to summarize what has been so well stated by Mr. Justice Letton in a carefully prepared opinion. The principle announced is applicable to the case we have before us.

It has often been said by our courts that judges cannot, and should not, close their eyes to facts which are of common knowledge and which they as individuals

know. In this case it is matter of common knowledge that the so-called Moffat Road, whose receivers are defendants in this action, in its operations is attended with most unusual and difficult conditions which necessarily materially affect the speed which it is practicable to maintain in the operation of its trains. Probably all of the judges who participate in this opinion have passed over the road in passenger trains and have seen for themselves the natural obstacles and difficulties with which the management is confronted in operating all of its trains. While, as judges, we do not base our decision upon our own knowledge, or give effect to our individual views upon the subject, unaided by the evidence in the record, yet our knowledge of the railroad and our familiarity with the difficulties of operation enable us to understand and appreciate and apply to the important question before us the evidence of the witnesses for both parties.

The record bears witness to the fact that the presiding judge entertained grave doubt as to the constitutionality of the act in question under the evidence adduced at the trial. Aside from this feature of the case the rulings of the court during the progress of the trial and its instructions to the jury were conspicuously fair and well calculated to safeguard the rights of the defendants. Doubtless impressed with the fact that a federal question was raised, the trial judge apparently concluded that it was a safer and wiser course to submit the controverted questions of facts to a jury so that, in event of a finding for the plaintiff, the defendants would thereby be enabled to bring before the reviewing courts the applicability and constitutionality of this statute in the peculiar conditions under which operation of its railroad is carried on. While our district courts are invested with the same authority that we possess to pass upon constitutional questions, they are reluctant to do so in the absence of a controlling decision of the Supreme Court of the state or the United States upon the point so re-

quiring, and refrain from adjudging a statute invalid, until the ultimate authority has had an opportunity to give expression to its opinion.

We repeat that while the legislature of a state has the power to impose limitations on the time for the transportation of live stock, the statute must be a reasonable exercise of such power, and while a statute may, as to one or more railroads in the state, be applicable and may be complied with by them, it may be inapplicable and unconstitutional if, because of the location of the railroad and the difficulties attending its operation, it would be practically impossible, with due regard to the safety of its employees and the public, to comply with its provisions. This doctrine is tacitly involved in the expression of Mr. Justice McKenna in his opinion in the Cram case where he said: "And the court," referring to the Nebraska court, "confined the act strictly to culpable violation of its requirements." The word "culpable" was advisedly employed and it means a wilful violation without just cause or excuse.

It follows that the judgment of the district court is wrong and it should be, and it is hereby, reversed and the cause remanded with instructions to the trial court to set aside its judgment and to dismiss plaintiff's action.

MR. CHIEF JUSTICE BURKE and MR. JUSTICE BUTLER not participating.